In an action on the case, brought by a husband against the father of his wife, for enticing her away, &c. it was held that the action would lie, but that the jury, to justify a verdict for the plaintiff, should have much stronger evidence of malicious and improper motives in the defendant, than where the action was against a stranger; the presumption being in favour of the defendant, that he was actuated in his conduct, in taking his daughter home, by parental affection; and on the ground, that the judge and jury had not sufficiently considered the distinction between this and an ordinary suit by the husband against a stranger, and from the peculiar circumstances of the case, as well as the amount of the verdict, a new trial was granted.

HUTCHESON *against* PECK.

THIS was an action of trespass on the case, for enticing away the wife of the plaintiff, and continuing to separate the plaintiff's wife from him, whereby he lost her services and his comfort, &c.

The cause was tried at the *Dutchess* circuit, on the 17th *September*, 1808, before Mr. Justice *Van Ness.*

At the trial, it was proved that the plaintiff and his wife, who is the daughter of the defendant, were married at her father's house, and with his consent ; and that they lived together at the defendant's house, for 8 or 10 months after the marriage.

*Joseph Conklin,* a witness for the plaintiff, testified, that he lived with the plaintiff, on a farm, at *Claverack,* in *Columbia* county, about 11 months, and the plaintiff and his wife lived together affectionately ; and they had a child, which was afterwards drowned. The plaintiff gave up the farm at *Claverack,* and removed back to *Amenia,* in the county of *Dutchess,* near the defendant. The witness carried a part of the household furniture, &c. of the plaintiff to his house, on the mountain farm ; when he arrived at the defendant's house, on his way to the plaintiff's, the defendant offered to keep part of the furniture, until the road was better, and engaged to carry it up to the plaintiff's house when he wished. That the plaintiff was well provided for living ; the witness carried provisions to his house, and drove 36 sheep for the plaintiff, when he removed from *Claverack ;* that the plaintiff had cows and horses ; and grain was sown on the mountain farm, at *Amenia,* which belonged to the plaintiff. The plaintiff's wife went to stay with the defendant, while the plaintiff was settling his affairs at *Claverack.*

*Ando Fraser,* another witness for the plaintiff, testified, that in a conversation, in *March,* 1801 or 1802, with the

NEW-YORK,
Nov. 1809.

HUTCHESON
v.
PECK.

defendant, about the plaintiff's removing from *Claver-ack*, the witness asked what the plaintiff would do with his family, and the defendant said the plaintiff would not have any family, for he meant to take the plaintiff's wife home, and not have her live with the plaintiff any longer ; that the plaintiff was coming to nothing, and would not be able to support his wife, and that if he (the defendant) did not take her home then, he should have to do it soon. After the plaintiff's wife had been at the defendant's a few weeks, the plaintiff came there, and stayed 8 or 10 days, while the defendant was absent, and the next morning after his return, the plaintiff and defendant had a conversation together. The defendant asked the plaintiff what he was going to do about living, and the plaintiff replied, he was going to live on the mountain farm. The plaintiff and defendant fell into a dispute, when the witness went out of the house, and on his return he found them quarrelling ; the defendant had pushed the plaintiff out of the house, and told him he should not come into his house again. He called the plaintiff a rascal, and said he had struck him. The plaintiff then demanded his wife and property ; and the defendant told him he should have neither. The witness heard the defendant say, that the plaintiff's wife should never live with the plaintiff again. The defendant told the plaintiff's wife that she might go and live with the plaintiff, if she had a mind to do so ; but if she did, she should never come into his house again, and the family should not visit her. She once went out, and was absent some time, and on her return, the defendant appeared angry, and asked her if she had not seen the plaintiff ; she confessed that she had seen him ; and the defendant told her, that if she had any thing to do with the plaintiff, she must quit his house. The defendant also told her, that if she would stay with the defendant, and have nothing to do with the plaintiff, he would do by her as he did by the rest of his children, and as he had done before she was mar-

NEW-YORK,
Nov. 1809.

HUTCHESON
v.
PECK.

ried ; but if she had any intercourse with the plaintiff,
she must quit the defendant's house, and should have
nothing from him, nor be allowed to visit him.

*Thomas Van Alstyne,* another witness, testified, that
he called on the defendant, at the request of the plaintiff,
to see if a settlement could not be made between them.
The defendant said he had nothing to settle with the
plaintiff, and that he should not come into his house ;
that his wife might stay there, and if she stayed, he
would do as well by her as he did by the rest of his
children ; but if she went away, he would never give
her any thing ; that he had only lent the furniture, and
that should not go, if she went ; that if she went, she
would only live like a squaw in a wigwam, and that he
would rather give 1,000 dollars, than have her go and
live in the house on the mountain. The plaintiff, the
witness said, had enough to live on, and his farm on the
mountain was worth 1,200 or 1,500 dollars, though there
were some incumbrances on it.

Two other witnesses testified to conversations with the
defendant, in which he made similar declarations, as to
the plaintiff's wife, with those above stated ; he said the
plaintiff was a poor lazy fellow, and had squandered
away his property ; that his farm was incumbered to its
value, and the plaintiff liable to be turned out of possession ;
that he did not mean the plaintiff's wife should go to him ;
that he should not advise her to go or stay ; she might do
as she pleased ; but if she did go, she must not expect to
come back again, or receive any benefit from him, or to be
visited by the family ; but if she stayed, he should do by
her as he did by the rest of his daughters. The witnesses
were sent to the defendant by the plaintiff, who appeared
to be anxious to get his wife back, and afflicted at her se-
paration from him. It appeared that the plaintiff was
idle, unsteady in his conduct, fond of company, and
in debt, but not more than he was able to pay. The
house on the mountain farm was indifferent ; it had been
occupied one winter, with some " patching up."

NEW-YORK,
Nov. 1809.

HUTCHESON
v.
PECK.

The defendant produced *Joseph Sage*, as a witness, who testified, that he was present at a conversation between the plaintiff and *Thomas Adams* and others, when *Adams* told the plaintiff that he had been to the defendant's, and that the wife of the plaintiff said she would come and live with him, if he could support her. The plaintiff said that was not his main object ; that he meant to get 1,000 dollars, or 1,000 pounds, out of old *Peck*, meaning the defendant, in a law suit to be brought, and asked *Adams* if he did not think that was easier than to work for it; that it was his wife's notion, as well as his, to have a suit brought, and that he could have his wife to live with him whenever he pleased.

*Thomas Adams*, *Eunice Adams*, and *Patty Mosher*, who were present at the same conversation, testified to the same facts. The latter stated further, that the plaintiff said he could have his wife to live with him if he chose, but the house on the hill was not fit to live in ; that the defendant was more able to support his wife than he was, and that he was willing that she should stay with the defendant. This conversation took place in *June*, after the plaintiff's removal from *Claverack*.

*Loring Peck* testified, that the defendant often told the plaintiff's wife that she could go and live with the plaintiff, but that the defendant would not support both of them.

*William B. Peck*, the defendant's son, testified, that he and his mother, hearing of the misfortunes of the plaintiff and his wife, and the loss of their child, and that she was sick, went to see them at *Claverack*. The plaintiff's wife proposed to return, with the witness and his mother, to her father's house, and the plaintiff advised and agreed to it. About two weeks after the plaintiff's wife came to the defendant's, the plaintiff came there from *Hudson*, and staid 10 or 12 days. The plaintiff proposed to remove his wife to his house on the mountain farm, and she was willing to go, if the house was made comfortable. She was then unwell, not having per-

fectly recovered, since her return from *Claverack*. The defendant said to the plaintiff, that he ought to go to some business, and not idle his time away, as he had done ; the plaintiff replied, it was no concern of the defendant, and he could manage his own affairs. A dispute and quarrel ensued between the plaintiff and defendant. The plaintiff called frequently at the defendant's house, and was abusive to the defendant and the family. About three months after the quarrel, the plaintiff came to the defendant and demanded his wife. The defendant told the plaintiff, that his wife was at liberty to go when she pleased. The plaintiff went into the house to converse with his wife, and stayed with her about two hours. The defendant always told the wife of the plaintiff that she might go to the plaintiff, or stay and be supported by the defendant ; that she was unwilling to go and live in the house on the mountain.

The judge charged the jury, that in his opinion there was sufficient evidence to warrant a verdict for the plaintiff ; but if the jury supposed, from the testimony, that the plaintiff was so extremely poor, that what the defendant had done was to save the plaintiff's wife from distress, they ought to find a verdict for the defendant. But if that was not the case, the poverty of the plaintiff, was no justification, but rather an aggravation ; for it was the duty of the wife, in such a case, to live with and assist the plaintiff, in retrieving his affairs ; that if the jury believed, that the defendant had been actuated in his conduct by parental affection towards his daughter, without any intention to injure the plaintiff, it would go far in mitigation of damages ; and if the jury supposed that the plaintiff's wife had resided with the defendant, with the consent of the plaintiff, it was a justification ; but if the jury believed that the defendant had premeditated a separation of the plaintiff from his wife, and had done it maliciously, and from improper motives, they

ought to make him smart for it : that these were mat-
ters of fact for the consideration of the jury. He ad-
vised them further, that in making up their verdict, they
might give full scope to their feelings, as fathers and hus-
bands.

The jury found a verdict for the plaintiff, for 1,200
dollars damages.

A motion was made to set aside the verdict, and for a
new trial :

1. Because the verdict was against evidence.

2. For the misdirection of the judge.

3. Because the damages were excessive.

*Evertson*, for the defendant, observed, that anciently
the rights and duties of husband and wife were enforced
with great rigour ; and the husband had power to chastise
the wife ; but that the severity and strictness of the an-
cient law seemed to be relaxed in modern times.

In a case where a stranger harboured the wife of ano-
ther, with her consent, the law would not, in ordinary
cases, punish him severely. But where a father, from
parental affection, takes his daughter home, and turns
away an idle and unworthy son-in-law, the case is enti-
tled to the utmost indulgence ; and, under certain circum-
stances, the father would be completely justified. The
present action is novel; a similar one was not, he be-
lieved, to be found in the books.

In the case of *Philp* v. *Squire*,\* where the wife of the
plaintiff represented herself to have been ill used by her
husband, who, she said, had turned her out of doors; and
the defendant took her into his house, at her request, and
suffered her to continue there, after notice from the hus-
band not to harbour her, Lord *Kenyon* held, that when the
wife is received and harboured, from principles of huma-
nity, the action could not be supported ; and that it was of
no consequence whether the representations of the wife
were true or false. The ground of this action, his lordship

\* *Peake's N.
P. Cases*, 82.

NEW-YORK,
Nov. 1809.

HUTCHESON
v.
PECK.

said, was, that the defendant retained the plaintiff's wife, against the inclination of her husband, whose behaviour he knew to be proper, or from selfish and criminal motives. That this kind of action differed materially from that for harbouring an apprentice ; the ground of action in that case being for a loss of service. Was not the defendant, in the present case, actuated by parental feelings, and motives of tenderness to his child ? Can it be imagined, for a moment, that his motives were selfish or criminal ? On what principle, then, can this action be supported on the evidence before the court ? It is a verdict manifestly against evidence.

2. But, at least, the damages must be considered as excessive. There was no proof whatever of malice in the defendant. On the contrary, it appeared, that he acted from the best and most disinterested motives ; the plaintiff's wife went, with his consent, to the house of her father, where she stayed voluntarily from considerations of prudence. There is evidence, also, that the plaintiff has been governed more by malice against the defendant, in bringing this action, than by a real desire of having his wife back again.

*Ruggles* and *E. Williams*, contra, contended, that the injury was much greater in this case, than that of enticing and harbouring a servant, which was a mere loss of service. It has been repeatedly decided, that an action like the present will lie. The *gist* of the action is the loss of the comfort and society of the wife.* This is an injury for which the party must have his remedy ; and the only question was, as to the amount of damages. The charge of the judge to the jury was perfectly correct ; and the jury were the only proper judges of the just measure of damages, on the evidence before them. But the court will never interfere to set aside a verdict, on the ground of excessive damages, unless they are outrageously excessive, or the court are satisfied that the jury acted from

* Willes, 577.
Bull. N. P. 78,
79. Peake's N.
P. 7. 5 Term
Rep. 357.

improper motives, or from gross misconception, which cannot be pretended in this case.*

NEW YORK,
Nov. 18:9.

HUTCHESON
v.
PECK.

* 1 Bur. o w,
542. 609. 2 Wils.
160. 205. 244.
252. Cowp. 230.
4 Term Rep.
651. 6 East, 244.

*Foot*, in reply, said, that the plaintiff was bound to make out that the defendant *unlawfully* separated the wife from her husband, and against his consent, in order to maintain the action. The evidence did not warrant the conclusion, that the conduct of the defendant was unlawful or improper. And the charge of the judge, he contended, was incorrect, and calculated to mislead the jury, by directing them to give full scope to their feelings, in making up their verdict.

VAN NESS, J. That an action will lie by the husband against any person who unlawfully persuades, and procures his wife to live apart from him, is not to be denied. There is, however, a feature in the present case, which distinguishes it, in point of fact, from any other that has come under my observation. The suit is against the *father* of the wife. That circumstance, however, cannot vary the rights of the husband ; nor take this case out of the general principles which form the basis of this action.

The first question which is presented for consideration, is, whether the defendant has caused the separation of which the plaintiff complains. This was a question of fact submitted to the jury, who having found for the plaintiff, their decision must be final ; unless this court should be of opinion that the verdict is not supported by the evidence. There can be but little doubt, that if the wife had been left to her own volition, she would have returned to her husband. Before the unfortunate interference of the defendant, she appears to have been contented and happy. She had never suffered for the want of the necessaries, or conveniences of life. She had been treated, for aught that appears, with ten-

derness, and her attachment to her husband was undiminished. That she should, under such circumstances, have voluntarily deserted him, is incredible. But she did desert him ; and seeing the effect, it is easy to trace it to its true cause. The defendant, by the exercise of parental influence and authority ; by means of threats at one time, and promises at another; by refusing to restore to her her furniture, under the pretext that it was his, finally succeeded in his design to produce a separation. I am satisfied the jury did not err in their judgment, on this part of the case.

The question then arises, whether this interference of the defendant has been justified ? I think it has not. If the injury complained of, has been sufficiently shown, the defendant's standing in the relation of a father to the wife, is an immaterial circumstance. Upon her marriage, which appears to have been with the defendant's consent and approbation, his right to the society and services of his daughter, was transferred to her husband; and for a violation of that right, the husband has his action, whoever may be the offender. I am now speaking of the marriage contract, as a civil contract, and of the marital rights which are legally acquired under it. It would be useless here to state in what instances the parent of the wife is authorised to interfere between her and her husband. I will confine myself to the justification relied on in the case.

If the defendant received his daughter into his family from motives of humanity, and with a view to shield her from present or impending distress, he was justifiable. The jury have found, and they were justified by the evidence to find, that such were not his motives. We cannot be at a loss to discover the reasons by which the defendant really was influenced. He unfolded his whole plan to one of the witnesses, (*Ando Fraser*,) at the time when his daughter came to his house, upon her

removal from *Claverack*. He stated, " that he was appre-
hensive he would soon have to maintain her, and that if he
did not take her home then, he would have to do it soon."
It is not true that there was any just ground for such
apprehension. From the testimony it appears that there
never was a period when the plaintiff did not possess the
disposition and ability to support his wife, to whom he
was fondly attached, in the same manner he had pre-
viously done. Shall a parent then be indulged in separa-
ting the wife from her husband, whenever he chooses to
say, he entertains an *apprehension*, that at some future
period, he may be compelled to support her? As long
as the wife owes to her husband loyalty and assistance,
it is not permitted to any one, to seduce her from the
performance of her duty, for such a reason. It is said
the motives of the defendant were pure. Admitting they
were so, that cannot affect the plaintiff's right to recover.
The true and the only inquiry is, has the conduct of the
defendant occasioned *damnum cum injuria* to the plain-
tiff. If both have been shown, this action is maintain-
able. If it was the duty of the wife to return to her hus-
band, the defendant did an unlawful act by persuading her
to violate that duty. If the wife was unjustifiable in
abandoning the plaintiff, the defendant is responsible for
having enticed and persuaded her to abandon him. The
good motives of the parent, therefore, do not always af-
ford a defence against this action.

In the case of *Winsmore* v. *Greenbank*, (*Willes's Rep.*
581.) the court ruled, that " though it should be laid,
that the plaintiff lost the comfort and assistance of his
wife; yet if the fact that is laid by which he lost it, be a
lawful act, no action can be maintained. By *injuria* is
meant a *tortious* act; it need not be *wilful* and *malicious*,
for though it be *accidental*, if it be *tortious*, an action will
lie."

NEW-YORK,
Nov. 1809.

HUTCHESON
v.
PECK.

NEW-YORK,
Nov. 1809.

HUTCHESON
v.
PECK.

That a parent's conduct, in cases like the present, is to be liberally construed, and that worthy motives are to be presumed, I fully admit. This is clearly the dictate of both reason and nature.

I agree that if the defendant had not been instrumental in *procuring* his daughter to live apart from her husband, and he had gone no further than to receive and support her, that this action could not be sustained ; and then the case of *Philp* v. *Squire* (*Peake's N. P. Rep.* 82.) would have been in point. Very different, however, will be the conclusion, when the parent unlaw-fully *produces* the separation, by sowing the seeds of discord and hatred ; thereby poisoning the sources of domestic harmony and enjoyment.

The remarks of Ch. J. *Willes*, in *Wensmore* v. *Greenbank*, fully apply to the case under consideration. In answering one objection made to the sufficiency of the declaration, he says, " To be sure it must be an *unlawful* procuring. It is not necessary to set forth all the facts to show how it was unlawful. It was said, however, that at least it was necessary for the plaintiff to add, " by *false* insinuations ;" but it is not material whether they were true or false ; if the insinuations were *true*, and by means of those the defendant *persuaded* the plaintiff's wife to do an unlawful act, it was unlawful in the defendant." And again, " Every moment that a wife continues absent from her husband, (without justifiable cause,) without his consent, is a new tort, and every one who persuades her to do so, does a new injury, and cannot but know it." In my opinion the plaintiff is entitled to recover ; and the only remaining question is, whether we can set aside the verdict on the ground that the damages are excessive.

I have examined the cases on the subject, and though there is no doubt that the court has the right to grant new trials, when it is apparent that the damages are out-

NEW-YORK,
Nov. 1809.

HUTCHESON
v.
PECK.

rageously disproportionate to the injury committed, yet it is a power which ought to be cautiously exercised. The conduct of the defendant here was unlawful, and the injury done to the plaintiff is a serious one. The measure of damages depends on sentiment and opinion ; and I am compelled to say, in the language of another, that " although I feel great difficulties on one side and the other, I have not courage enough to make the first precedent of granting a new trial, under such circumstances as the present." (Lord *Kenyon*, in *Duberly* v. *Gunning*, 4 *Term Rep.* 651.) I am satisfied that to set aside a verdict in such an action as this, on the ground that the damages are excessive, would be directly against a series of adjudged cases, both in this court and in *England ;* and much as I regret that the damages are so high, I cannot agree to bend the settled rules of law, to grant relief against the hardship of a particular case.

My opinion, upon the whole, is, that the motion for a new trial ought to be denied.

SPENCER, J. The defendant is the father of the plaintiff's wife ; she came to the defendant's house, by the consent of her husband ; the defendant has continued to afford her shelter and support, after having been forbidden by the plaintiff. No other means have been made use of by the defendant to detain her, than declarations, that if she remained with him, she should fare as his other children ; but if she went away, she should have no part of his estate ; and it was always left to her option to go or to stay. The jury gave 1,200 dollars damages.

It is believed that the books furnish no precedent for this kind of action, for the abduction of the wife, against her father, who only affords her an asylum ; leaving it to her free will to go or to remain. The novelty of the action is no argument against its being sustained ; and if a father shall maliciously and improperly afford protection,

even to his child, against the will of her husband, and thereby deprive him of the comforts he is entitled to enjoy from her aid and society, most undoubtedly an action will lie. In the present case, I confess, my impression from reading the case is, that the defendant was influenced altogether by parental affection, in doing what he did. The house the plaintiff had provided for his dwelling appears to have been old and ruinous, and his wife was in delicate health; and I perceive no foundation for the opinion that the defendant maliciously meditated a separation between the husband and wife. On the latter ground alone the jury must have proceeded in giving such severe damages. I am not satisfied that the plaintiff was entitled to recover; but I am perfectly satisfied, that he was not entitled to recover, as for having maliciously and causelessly meditated a separation of the plaintiff from his wife. Without, therefore, saying that the damages given in this case would be excessive, had the plaintiff made out his case, I think the court have a right to regard the amount of the verdict in exercising their discretion as to awarding a new trial, under the peculiar circumstances of this case. Accordingly I am of opinion, that there should be a new trial.

YATES, J. was of the same opinion.

THOMPSON, J. This was an action on the case, for enticing away the plaintiff's wife by the defendant, who was her father. Although the light in which the law views a charge of this description, may warrant the maintenance of an action against the father, when the circumstances are aggravated; yet no case of the kind is, I believe, to be found in the books; and, in my judgment, such a case ought not to be considered as standing on the same footing as if the action was against a stranger. A father is bound, by the laws of nature, to afford protection

and comfort to his child ; and the same acts which in him ought to be considered as proceeding from parental affection, might in a stranger be deemed to proceed from improper and unjustifiable motives. The bare harbouring of a married woman by a stranger, from motives of humanity, will not give to the husband a right of action. (*Peake's N. P.* 82.) Although in the present case the plaintiff might have been able to furnish his wife with the necessaries of life, yet it is evident she was deprived of many of the comforts and conveniencies to which she had probably been accustomed. No coercion or parental authority was made use of to detain her. The uniform language of the defendant to her was; that she might go and live with the plaintiff if she chose ; and if the inducements held out to her to remain with her father, were carried beyond the bounds of prudence and discretion, still they ought to be viewed with many grains of allowance, as proceeding from parental tenderness. It does not appear to me, that due weight was given upon the trial, either by the judge or the jury, to the distinction I have suggested, between this case and one where the action is against a stranger. The *quo animo*, with which the defendant acted, ought to have been made the material point of inquiry ; and from the facts and circumstances detailed in the case, I should very much doubt the correctness of the conclusion, that the defendant must have been actuated by illegal and corrupt motives. Under all circumstances, taking into consideration the novelty of the action, I think it is one of those cases, in which a due regard to the ends of justice, and a discreet exercise of the power of the court, fully warrant us in sending back the cause to another jury.

KENT, Ch. J. I am also for a new trial. If the defendant did not stand in the relation of father to the plain-

tiff's wife, I should not, perhaps, be inclined to interfere with the verdict. But that relationship gives the case a new and peculiar interest; this is the first action of the kind I have met with, brought against the father. A father's house is always open to his children; and whether they be married or unmarried, it is still to them a refuge from evil, and a consolation in distress. Natural affection establishes and consecrates this asylum. The father is under even a legal obligation to maintain his children and grandchildren, if he be competent, and they unable to maintain themselves; and according to Lord *Coke*, it is "nature's profession to assist, maintain and console the child." I should require, therefore, more proof to sustain the action against the father, than against a stranger. It ought to appear either that he detains the wife against her will, or that he entices her away from her husband, from improper motives. Bad or unworthy motives cannot be presumed. They ought to be positively shown, or necessarily deduced from the facts and circumstances detailed. This principle appears to me to preserve, in due dependence upon each other, and to maintain in harmony, the equally strong and sacred interests of the parent and the husband. The *quo animo* ought, then, in this case, to have been made the test of inquiry and the rule of decision. The judge told the jury, that if the defendant was not actuated by improper motives, it would go very far in mitigation of damages. I think the instruction should have gone further, and the jury have been informed, that in such a case the verdict should be for the defendant. I am accordingly of the opinion, that a new trial should be awarded, with costs to abide the event of the suit.

New trial granted.