# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CA-01800-SCT

*JERRY FITCH, SR.*

*v.*

*JOHNNY VALENTINE*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/12/2005 |
| TRIAL JUDGE: | HON. ANDREW K. HOWORTH |
| COURT FROM WHICH APPEALED: | MARSHALL COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DION JEFFERY SHANLEY |
| | S. DUKE GOZA |
| ATTORNEYS FOR APPELLEE: | MICHAEL ALFRED JACOB |
| | RALPH EDWIN CHAPMAN |
| NATURE OF THE CASE: | CIVIL-TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 04/19/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     Before this Court today is a classic "he said"/"she said"/"the paramour said" case.  It commenced when Johnny Valentine ("Valentine") filed a civil complaint against Jerry Fitch, Sr. ("Fitch") in the Circuit Court of Marshall County, Mississippi, averring various causes of action, including alienation of affections.  Valentine is a plumber, Fitch is a millionaire who owns various businesses, primarily involving oil and real estate.[1]  At the conclusion of a trial on the merits, a jury unanimously rendered a verdict against Fitch and awarded

---

[1]An April 29, 1998, financial statement of Fitch revealed a net worth of nearly $22 million.

Valentine $642,000 in actual damages and $112,500 in punitive damages. Thereafter, Fitch filed a consolidated motion for judgment notwithstanding the verdict, new trial, and remittitur, which the circuit court denied. Fitch has filed this appeal.

**FACTS**

¶2. The record reflects that Valentine and Sandra Day[2] ("Sandra") were married on February 12, 1993. In 1995, the couple had a son together, J.V. In the spring of 1997, Sandra began working as a realtor for the Fitch Realty division of Fitch Oil Company and earned around $400 a week in cash, based upon her commissions, according to Fitch.[3] Sandra testified that the adulterous affair with Fitch began in late 1997 or early 1998. According to Fitch, the relationship commenced in 1998. Fitch testified to knowing that Sandra was married to Valentine and that the couple had a child together. It was established at trial that Fitch testified at his deposition that he did not care if his affair with Sandra might affect her marriage to Valentine.

¶3. Valentine testified that his marriage to Sandra was "normal" prior to late 1998 and early 1999. The couple shared a joint checking account, ate meals together, and engaged in sexual relations "[l]ike normal couples" until that time. In June of 1998, Sandra became pregnant. During the fall of 1998, Valentine suspected Sandra was having an affair, but she

---

[2]Now Sandra Fitch, having married Fitch subsequent to her divorce from Valentine.

[3]Co-worker Susan Fleming, who was also a personal friend of Sandra and the former bookkeeper at Fitch Oil Company, testified that Sandra claimed she received only $500 a month in cash for her work.

2

denied any such wrongdoing.[4] In February 1999, a daughter, K.V., was presumptively born to the marital union. Valentine testified that, at that time, he believed K.V. was his child. He was present at the hospital for K.V.'s delivery and was listed as K.V.'s father on her birth certificate; and he loved and cared for K.V. According to Valentine, "a few weeks after [K.V.] was born" he began to notice changes in Sandra.

¶4. At trial, Fitch testified that he was aware that K.V. was his child "a month or two after she was born[,]" even though in the divorce proceedings from his wife of thirty-five years, he admitted he knew K.V. was his child three or four days after her birth.

¶5. One night in August 1999, Sandra was not home by 10:30 p.m., and Valentine drove toward Fitch's cabin looking for her. After observing Sandra driving on Highway 4, Valentine flagged her down. Valentine testified that upon being confronted about an affair, Sandra once again denied any wrongdoing and came home with him. Thereafter, Valentine repeatedly requested that Sandra quit her job at Fitch Realty, but she consistently refused to do so. During this time frame, Valentine testified to finding "[t]wo or three hundred here and three or four hundred there, a thousand, $1,100 in different places" around their home. Sandra claimed she made this money at work. Valentine testified that the cash was more than he had previously observed her earning. Sandra's co-worker Susan Fleming testified that, prior to the divorce, Sandra told her that Fitch had given her $8,000 to buy a new Jeep Cherokee, which she acquired soon thereafter.[5] Fleming also testified that shortly after K.V.

_____

[4]Conversely, Sandra testified that Valentine knew of her affair with Fitch at this time and knew that the child may have been Fitch's.

[5]Valentine testified that Sandra came home with a new Jeep Cherokee and he had no idea where she obtained the funds to purchase it.

was born, Sandra told her that Fitch had purchased a baby bed, high chair, baby seat, baby clothes and other baby items for K.V. Fitch readily admitted to giving money to Sandra between February 1999 and August 1999. Fitch, however, testified that he never paid Sandra to date or marry him, or to entice her away from Valentine.

¶6. On August 28, 1999, Valentine and Sandra separated. In September 1999, DNA testing conclusively excluded Valentine as K.V.'s biological father. Nonetheless, Valentine still offered to raise K.V. as his own child if Sandra would end the adulterous affair with Fitch. Sandra refused.

¶7. Valentine filed for divorce on October 28, 1999, and the divorce decree was entered on November 23, 1999. The decree specifically stated that "[t]he evidence presented in open [c]ourt clearly establishes that [Valentine] is entitled to a divorce on the grounds of *adultery*." (Emphasis added). Prior to the divorce, Valentine testified that Sandra never told him that she did not love him or that she wanted a divorce. He further testified that the marriage failed because Sandra "couldn't resist all the money[,]" and that absent Fitch's interference, the marriage would have remained intact.

¶8. As can be expected, Sandra denied "selling [her] affections" and testified that her affections for Valentine were absent before the adulterous affair with Fitch commenced. According to her testimony, she loved Valentine when they first married. By the time J.V. was born, however, Sandra said the marriage was only "okay." She stated:

> [b]efore his gambling problem, Johnny loved to be with his buddies. He would not come home from work. He would drink. There's been occasions where I've gone looking for Johnny when he was with his buddies, and his

4

remark was, I embarrassed him by coming to where he was to try to get him to come home to be the husband that he should be.[6]

Sandra further testified that, at that time, she "was still, obviously, in love with him. I tried to get him to change and be different, but . . . he didn't." Sandra said the breaking point came in January 1996, when she went to a casino looking for Valentine. She claims to have told him that if he did not leave the casino at that moment then their marriage was over. When he did not leave, Sandra states that "I didn't care if he went every night, and that's when our marriage was over[,]"[7] although she further testified that their sexual relationship did not effectively end until 1997 or 1998. According to Sandra, the couple "separated [on] several occasions about [gambling], and he would promise that he would get help, and he didn't . . . ." Valentine denied having a gambling problem or that the couple ever separated.

¶9. Sandra asserted that the adulterous relationship with Fitch, which she claims to have initiated, was caused by her unhappy marriage to Valentine. Furthermore, while she and Fitch engaged in sex two or three times a week, she maintained that the adulterous sexual activity had no effect on her alleged nonexistent desire to have sex with Valentine.

¶10. On December 21, 1999, Valentine filed suit against Fitch alleging various causes of action, including alienation of affections. In Fitch's answer, response to Valentine's first set of interrogatories, and response to Valentine's first set of requests for admission, filed when

---

[6]Valentine denied drinking to an extent that it interfered with his marriage or job, and further testified that he did not recall Sandra confronting him about going out with his friends.

[7]Valentine testified that he did not recall Sandra confronting him about gambling in this, or any other, instance. Despite the claim that Valentine's gambling instigated Sandra's loss of affection, she failed to offer any evidence of gambling debts.

K.V. was more than one year old, Fitch *denied* having had sexual relations with Sandra, being the father of K.V., or giving Sandra any monetary support beyond her salary.[8]

¶11.   Following trial, the jury unanimously found for Valentine and awarded him $642,000 in actual damages and $112,500 in punitive damages against Fitch.  On April 12, 2005, the circuit court entered judgment against Fitch and in favor of Valentine "for the total sum of $754,500 and interest thereon in the amount of 8% per annum and all costs . . . ."  Thereafter, Fitch filed his consolidated motion for judgment notwithstanding the jury verdict ("JNOV"), new trial, and remittitur.  Following Valentine's response, Fitch's reply for the first time requested the circuit court to abolish the tort of alienation of affections.[9]  Following a hearing, the circuit court concluded that:

> [t]he jury's verdict . . . seemed to be a lot of money to me; but if I correctly instructed the jury on the elements of their damages and if the jury was entitled to consider once they arrived at a conclusion about liability, considered the elements that I instructed them on, *I can't second-guess them, don't have the authority to do so, don't want to do so. It's the jury's job to establish the value of the loss and they've done so and I cannot say the amount of the verdict is such to justify the Court granting the motion to remit the verdict.*  The Court is going to deny all motions.

(Emphasis added).  On September 16, 2005, Fitch filed his notice of appeal.

### ISSUES

¶12.   This Court will consider:

(1) Whether the tort of alienation of affections should be abolished on public policy grounds.

---

[8]In amended responses filed six months later, on the day before his deposition, Fitch admitted to having sexual relations with Sandra and being the father of K.V.

[9]Valentine filed a motion to strike the portion of Fitch's reply addressing the abolition of the tort of alienation of affections.  The circuit court granted Valentine's motion to strike.

6

(2) Whether the circuit court committed evidentiary errors.

(3) Whether the circuit court erred in instructing the jury.

(4) Whether the jury verdict was contrary to the overwhelming weight of the evidence.

(5) Whether the punitive damages award violates due process.

(6) Whether this Court should order a remittitur of the award in this case.

**ANALYSIS**

**I. Whether the tort of alienation of affections should be abolished on public policy grounds.**

¶13.    Fitch argues that this Court should abolish the tort of alienation of affections as a matter of public policy.  Fitch states:

> [t]he adversarial positions taken in this litigation over the intensely personal and private matters of [Valentine] and Sandra certainly does not serve as a shining example to the citizens of Marshall County that marriage as an institution must be preserved.

Fitch frames the trial as a "classic morality play" with "[t]he hapless victim; his wife's virtue stolen by the rich villain."  Fitch contends that since the divorce rate continues to escalate in Mississippi, the institution of marriage has already been devalued and the justification for this tort's continued existence is outdated and discredited.

¶14.    To the contrary, Valentine asserts that this Court "should continue to allow alienation of affection cases against third parties who cause the destruction and breakdown of the marital bond and family relationship."  Valentine further contends that "[t]he focus of this Court should be to continue to allow the viability of the tort which imposes liability . . . [and deters third parties] from intentionally interfering with a marriage."

¶15.    The tort of alienation of affections was recognized in Mississippi as early as 1926 in *McRae v. Robinson*, 145 Miss. 191, 110 So. 504 (1926).  In *Camp v. Roberts*, 462 So. 2d

7

726, 727 (Miss. 1985), this Court held "[w]here a husband [wife][10] is wrongfully deprived of his rights to the 'services and companionship and consortium of his [her] wife [husband],' he [she] has a cause of action 'against one who has interfered with his [her] domestic relations.'" *Id*. at 727 (citing *Walter v. Wilson*, 228 So. 2d 597, 598 (Miss. 1969), *overruled in part on other grounds*; *Saunders v. Alford*, 607 So. 2d 1214, 1219 (Miss. 1992)). Without question, Mississippi's recognition of the tort of alienation of affections places it among the minority of states. *See Helsel v. Noellsch*, 107 S.W.3d 231, 235 (Mo. 2003) (Benton, J., dissenting) (the other states are Illinois, Hawaii, New Mexico, North Carolina, South Dakota, and Utah). However, in his special concurrence in *Bland v. Hill*, 735 So. 2d 414 (Miss. 1999), Chief Justice (then Justice) Smith wisely responded to the "everybody else is doing it, so should I" view, by stating:

> [w]hile I agree that it appears society's moral values have changed during modern times, I do not believe Mississippi should get aboard this runaway train. I would also not take away an offended spouse's only legal means to seek redress in our courts for the wrongful conduct of a third party who wilfully and intentionally interferes in and aids in destroying a marriage.

*Id*. at 422 (Smith, J., specially concurring).[11]

---

[10]The tort of alienation of affections is equally applicable to women as men, avoiding any archaic notion that a wife is the property of her husband. *See Kirk v. Koch*, 607 So. 2d 1220, 1224 (Miss. 1992).

[11]I cannot adopt the position of a majority of states and minimize this activity which the legislature has defined as a crime against public morals and decency, and declared its penalty comparable to similar conduct between a teacher and pupil or a guardian and ward. *See* Miss. Code Ann. § 97-29-1 *et seq*. The Legislature has not seen fit to join the throngs who say these are only "affairs of the heart," "flings," or "stepping out," as a means of attaching validity to such conduct.

¶16.    In retaining the tort, this Court has stated that "the purpose of a cause of action for alienation of affection is the 'protection of the love, society, companionship, and comfort that form the foundation of a marriage . . . .'" *Id*. at 417 (quoting *Saunders*, 607 So. 2d at 1215). "The right sought to be protected is that of consortium."  *Saunders*, 607 So. 2d at 1215. Justice Smith's special concurrence in *Bland* explained the justification and need for continued recognition of the tort of alienation of affections, stating:

> [s]hould an individual be allowed to intrude upon a marriage to such an extent as to cause it to come to an end?  Does a spouse have a valuable interest in a marriage that is worthy of protection from the intruding third party? In my view, the answer to both questions is in the affirmative. *The traditional family is under such attack both locally and nationally these days that this Court should not retreat now from the sound view of the tort of alienation of affections espoused by this Court in* **Saunders** *as entitling a spouse to "protection of the love, society, companionship, and comfort that form the foundation of a marriage."* [**Saunders**, 607 So. 2d at 1215] (quoting **Norton v. Macfarlane**, 818 P.2d 8, 12 (Utah 1991)); *see also* **Horner v. Byrnett**, 511 S.E.2d 342 (N.C. Ct. App. 1999).  I do not believe that under the compelling facts of this particular case this Court should hold that the doctrine of alienation of affections has outlived its usefulness as a deterrent protecting the marital relationship of a husband and wife in cases where the facts clearly warrant.

*Bland*, 735 So. 2d at 422 (Smith, J., specially concurring) (emphasis added).  In addition to protecting the marriage relationship and its sanctity, *see id*. at 418, the tort of alienation of affections also provides an appropriate remedy for intentional conduct which causes a loss of consortium.  The dissenting opinion in *Helsel* summarized this position, stating:

> [i]n tort cases where a spouse is injured, the other spouse often has a separate claim for loss of consortium. ***Powell v. American Motors Corp.***, 834 S.W.2d 184, 188 (Mo. banc 1992).  Most of these losses are caused by a defendant's negligence.  In alienation of affection – an intentional tort – a defendant's intentional conduct causes the loss. *See* **Gibson** [***v. Frowein***,] 400 S.W.2d [418,] 421 [(Mo. banc 1966)].  It is inconsistent [if] the law compensates for

9

> negligent conduct causing a loss of consortium, but . . . does not compensate
> for intentional conduct causing the same loss.

*Helsel*, 107 S.W.3d at 234 (Benton, J., dissenting). *See also **Bland***, 735 So. 2d at 421

(Smith, J., specially concurring) ("there is no point in abolishing an otherwise valid common

law tort, especially now that we have leveled the playing field in ***Kirk***. Would the dissent

strike down *consortium* next?"). Therefore, in the interest of protecting the marriage

relationship and providing a remedy for intentional conduct which causes a loss of

consortium, this Court declines the invitation to abolish the common law tort of alienation

of affections in Mississippi.[12] Alienation of affections is the only available avenue to provide

redress for a spouse who has suffered loss and injury to his or her marital relationship against

the third party who, through persuasion, enticement, or inducement, caused or contributed

to the abandonment of the marriage and/or the loss of affections by active interference.

### II. Whether the circuit court committed evidentiary errors.

*(A) The use of Fitch's prior inconsistent statements, set forth in the pleadings, during Valentine's opening statement.*

¶17.     In Valentine's opening statement, his counsel discussed the charges contained in the

complaint and Fitch's various responses found in his answer, answers to interrogatories, and

responses to requests for admissions which set forth Fitch's repeated denials of having sexual

---

[12]One dissent suggests that "these suits inevitably do more to hurt families than to help them." I find more persuasive the counter-argument that damage actually arises from the adulterous conduct which first violates, and then destroys, the trust of not only the participants, but also of their respective families. To minimize and cast as theoretical the obvious negative consequences, such as the erosion of the marital relationship and the disruption to family unity ignores these empirical truths. The dissent's fatalistic presupposition that marriages experiencing affairs will "crash and burn," fails to recognize the reality of forgiveness and reconciliation.

relations with Sandra or being the father of K.V. Counsel for Fitch objected to the pleadings being referenced in Valentine's opening statement, arguing "they are not proof or evidence." The circuit judge overruled Fitch's objection.

¶18. Fitch now contends that the circuit court erred, maintaining that "argument and comments upon the credibility of witnesses are improper when made in opening statement." In support thereof, he cites *Balfour v. State*, 598 So. 2d 731, 749-50 (Miss. 1992), for the proposition that "before there can be impeachment, there must be testimony which is impeachable." According to Fitch, Valentine:

> proceeded to publish to the jury what he obviously considered passed for a predicate from which impeachment may commence: unsworn allegations of the [c]omplaint, unsworn denials in the [a]nswer. From here, [Valentine] proceeded with the 'testimony' – answers to interrogatories, deposition testimony, and responses to request for admissions. . . . [Fitch] had not taken the stand.

In Fitch's estimation, "the unsworn allegations were blown up and published to the jury obviously disproportionate to their significance . . . in light of the fact that many claims were abandoned in subsequent testimony." As such, Fitch contends that this error warrants a new trial.

¶19. In response, Valentine first submits that Fitch has waived this issue as he "only objected to [Valentine's] use of the unsworn pleadings on the basis for use as evidence[,]" but never objected "to the use of the unsworn pleadings on the basis of impeachment, which is the issue [Fitch] is raising on appeal." *See Johnson v. Alcorn State Univ.*, 929 So. 2d 398, 407 (Miss. Ct. App. 2006) ("[a]ppellate courts may not rule upon material matters which the trial judge did not have the opportunity to judge. *Ditto v. Hinds County, Miss.*, 665 So. 2d

11

878, 880 (Miss. 1995). Issues not raised at trial cannot be raised on appeal. ***Southern v. Mississippi State Hosp.***, 853 So. 2d 1212 (Miss. 2003).").

¶20.   Notwithstanding the alleged procedural bar, Valentine maintains that the prior inconsistent statements:

> were not being introduced during [Valentine's] opening statement as substantive evidence nor were they being 'offered for the truth of the matter asserted' but the pleadings were being used merely to define the issues the jury would decide and show [Fitch] made the statements and as such it is relevant regardless of its truth and it does not matter that the trier of fact is unable to ascertain [Fitch's] credibility.

In support of this position, Valentine notes that both his counsel and the circuit court informed the jury that the substance of the opening statement did *not* constitute evidence. Moreover, Valentine asserts that the pleadings "were used as demonstrative aids only . . . to describe the issues that the jury would decide, [Fitch's] defenses and that [Fitch] had made prior inconsistent statements."  In ***Haggerty v. Foster***, 838 So. 2d 948 (Miss. 2002), this Court stated:

> [d]emonstrative evidence may be admitted at the trial court's discretion, if such evidence was reasonably necessary and material, ***Murriel v. State***, 515 So. 2d 952, 956 (Miss. 1987), and appropriate and relevant. ***Gandy v. State***, 373 So. 2d 1042, 1047 (Miss. 1979). Furthermore, where error involves the admission or exclusion of evidence, this Court "will not reverse unless the error adversely affects a substantial right of a party." ***In re Estate of Mask***, 703 So. 2d 852, 859 . . . .

***Haggerty***, 838 So. 2d at 958. Valentine argues that "this evidence was necessary, material, appropriate, and relevant since [Fitch] testified that he provided information to his counsel to be used in answering the [c]omplaint." Finally, Valentine insists that "this reference was

12

cumulative of other and later similar denials, under oath, in response to both interrogatories and requests for admissions (which were also sworn) and if error at all, it was harmless."

¶21. The circuit judge's decision to overrule Fitch's objection is reviewed by this Court under an "abuse of discretion" standard. *See id*. This Court finds that the use of Fitch's prior inconsistent statements in Valentine's opening statement was permissible and the circuit court's decision to overrule Fitch's objection was not an abuse of discretion. Not only was the jury repeatedly informed that the content of the opening statements were not evidence, but Fitch's prior inconsistent statements in these pleadings were developed during his testimony at trial. Accordingly, this issue is without merit.

*(B) Evidence of Valentine's conduct prior to and after his marriage to Sandra.*

¶22. Fitch sought to solicit testimony regarding Valentine's adulterous conduct with Sandra at the inception of their relationship. Valentine filed a motion in limine to prevent Fitch from introducing any such evidence. The circuit judge granted Valentine's motion in limine. In support of that position, the circuit judge stated that "if you have any evidence of . . . relevant marital misconduct on his part while he's married to [Sandra], that's one thing. *Proof beforehand is something else*." (Emphasis added).

¶23. "[T]he standard of review regarding Rule 403 determinations is an 'abuse of discretion.'" *Baldwin v. State*, 784 So. 2d 148, 160 (Miss. 2001). Applying that deferential standard of review, this Court finds that the circuit court did not abuse its discretion in granting Valentine's motion in limine. Fitch's wrongful conduct was the issue in this case. The presence of a marriage relationship is necessary for the tort of alienation of affections to apply. Therefore, the time frame in which Valentine and Sandra were married, not their

13

pre-marriage conduct, was key. The meager probative value of evidence on the beginning of Valentine's relationship with Sandra was found to be outweighed by the undue prejudice it would create. As such, the circuit court did not abuse its discretion in granting Valentine's motion in limine, and this issue is without merit.

¶24. At trial, Valentine objected to Fitch mentioning another child born to Valentine following his divorce from Sandra. The circuit court precluded the introduction of such evidence, finding that "you should not inquire as to any after born children, if that's a correct term for it because that, in the Court's opinion, is *unduly prejudicial and of limited or no probative value*." (Emphasis added).

¶25. Once again, this Court applies the deferential abuse of discretion standard of review, *see id.*, and finds that the circuit court did not abuse its discretion in precluding the introduction of evidence regarding the child born to Valentine following his divorce from Sandra. The key time frame for the tort of alienation of affections is that of the marriage, within which this evidence clearly does not fit. Moreover, the circuit court found this evidence to be "unduly prejudicial and of limited or no probative value." As the circuit court did not abuse its discretion in so finding, this issue is without merit.

### III. Whether the circuit court erred in instructing the jury.

*(A) Instructions P-5 and D-8.*

¶26. Instruction P-5 was given to the jury by the circuit court and provided:

[i]n order for your verdict to be for [Valentine] and against [Fitch], you must find the following:

1. That the conduct of [Fitch] was wrongful;

14

2. A loss of affection or consortium was suffered by [Valentine]; and

3. That this wrongful conduct caused the loss of affection or consortium.

If you determine the above statements to be true, yo[u] must return a verdict for [Valentine] and award him damages in accordance with the Court's instructions.

If [Valentine] fails to prove any one or more of these elements by a preponderance of the evidence, then your verdict must be for [Fitch].

Instruction D-8, which was rejected by the circuit court as "repetitive," stated "[y]ou are instructed that in determining the cause of the loss of Sandra's affections [Valentine] must prove, by a preponderance of the evidence, that [Fitch's] direct interference in his marriage caused Sandra to lose affections for him."

¶27.    While conceding that Mississippi law has commonly listed the elements of the tort of alienation of affections just as in Instruction P-5, *see Saunders*, 607 So. 2d at 1215, Fitch argues that:

> as far back as *Stanton v. Cox*, 139 So. 458, 461 (1932), it is settled law that [Valentine] must prove [his] loss was occasioned by the direct interference of [Fitch]. Because the lower court's instruction allowed the jury to find liability without the predicate finding of proximate cause specific to this tort, the matter should be reversed for a new trial . . . .

¶28.    In response, Valentine initially contends that Fitch waived this argument because "[t]o preserve an objection to a jury instruction, the specific ground for the objection must be stated in the original objection. The issue raised on appeal may not be based on a different legal theory." *See Shields v. Easterling*, 676 So. 2d 293, 296 (Miss. 1996) ("Shields did *not* put this objection to the trial court *in any specific meaningful manner*. Thus, the trial judge

15

had no opportunity to rule on it. . . . Thus, this Court is *barred* from reviewing this issue.")

(emphasis added). At trial, Fitch objected to Instruction P-5 initially because he perceived

the wording to be "cumbersome." Once the language was rephrased, Fitch raised no further

objection. As to Instruction D-8, the circuit judge refused the instruction "because i[t]

becomes somewhat repetitive." According to Valentine, Fitch has failed to show that

Instruction D-8 "properly stated the law and was necessary to fully inform the jury of the law

considering the totality of the instructions[.]"[13]

¶29. This Court has stated that it "[i]f other instructions granted adequately instruct the

jury, a party may not complain of a refused instruction on appeal. *Purina Mills, Inc. v.*

*Moak*, 575 So. 2d 993, 996 (Miss. 1990). . . . [T]he trial court has considerable discretion in

instructing the jury." *Southland Enter. v. Newton County*, 838 So. 2d 286, 289 (Miss.

2003). This Court first finds this argument to be procedurally barred as Fitch failed to object

after Instruction P-5 was rephrased and therefore failed to properly preserve for appeal his

Instruction D-8 argument. Procedural bar notwithstanding, this Court concludes that the

circuit court properly exercised its discretion in finding Instruction D-8 "repetitive" of

Instruction P-5. Therefore, this issue is without merit.

*(B) Instruction P-8*

¶30. Instruction P-8 was given to the jury by the circuit court and provided:

> [y]ou are instructed that just compensation is a decision to be made by the jury.
> Your discretion as to the measure of damages is wide, but not unlimited, and
> you may not act arbitrarily. Exercise your discretion as to the amount of

---

[13]Fitch replies that "[i]f the trial court was correct in finding D-8 repetitive of P-5 . .
. [then Fitch] loses this point on the merits, not on a point of procedure."

damages reasonably, intelligently and in harmony with the evidence of the case and the Court's instructions. The damages cannot be assessed by an fixed rule, but you are the sole judges as to the measure of damages in this case.

Should you find for [Valentine] then you must determine the amount of money which will reasonably and fairly compensate him for the value of the consortium he has lost. You should consider the following elements of damage as have been proved by a preponderance of the evidence in this case:

> a. The loss of society, companionship, love and affection;
>
> b. The loss of aide, services, and physical assistance provided by [Sandra];
>
> c. The loss of sexual relations;
>
> d. The loss of participation together in the activities, duties and responsibilities of making a home;
>
> e. Any mental and emotional distress proximately resulting from [Fitch's] conduct; and
>
> f. Any other damages proven to have proximately resulted from any wrongful act of [Fitch].

¶31. Fitch cites *Cousar v. State*, 855 So. 2d 993 (Miss. 2003), for the proposition that "[g]ranting instructions not supported by evidence is error." *Id*. at 997 (citing *Haggerty*, 838 So. 2d at 955). Fitch then argues that the circuit court erred by approving "an instruction on damages which the evidence did not support, specifically allowing the jury to consider an award for any damage the jury thought appropriate despite the fact that [Valentine], on evidentiary grounds, abandoned all damages beyond the consortium lost with his wife and child."[14] Furthermore, Fitch contends that "[t]here is no temporal restrictions placed on the

---

[14]Fitch alleges that Valentine did this "to prevent examination of [himself] on issues relating to his adventures after his marriage to Sandra ended."

instruction. . . . These questions were significant insofar as [Valentine] continually prevented [Fitch] from going into matters that preceded or followed the marriage."

¶32.    In response, Valentine maintains that:

> [t]emporal restrictions were placed both on types of damages recoverable and as to what period of time the jury should consider since the jury was instructed to only award damages proven during the course of the trial to have proximately resulted from the wrongful acts of [Fitch]. The jury heard the evidence presented and unanimously determined the amount of damages that were proximately caused *by [Fitch's] wrongful acts*.

(Emphasis added). Furthermore, Valentine notes that "[t]he instructions must be read as a whole[,]" ***Phillips v. Dow Chemical Co.***, 247 Miss. 293, 304, 151 So. 2d 199, 203 (1963); Court Instruction No. 4 provided that any damages were to be proven by a preponderance of the evidence; and "it is and should be presumed that the jury followed the law."

¶33.    This Court "must view the instruction in light of all the other instructions which were given to determine whether the jury was properly instructed. ***Munford, Inc. v. Fleming***, 597 So. 2d 1282, 1286 (Miss. 1992). . . . [T]he trial court has considerable discretion in instructing the jury." ***Southland Enter.***, 838 So. 2d at 289. Instruction P-8 stated "[y]ou should consider the following elements of damages as have been proved by a *preponderance of the evidence* in this case[.]" (Emphasis added). As such, the damages awarded were limited to those proximately resulting from Fitch's wrongful acts during Valentine and Sandra's marriage. Granting such an instruction was proper and well within the circuit judge's discretion. Therefore, this issue is without merit.

18

**IV. Whether the jury verdict was contrary to the overwhelming weight of the evidence.**

¶34.	At the hearing on his post-trial motion for JNOV, Fitch argued that:

> because the plaintiff had not established the second element of the tort of alienation of affection [loss of affection or consortium] or a causal connection . . . between the defendant, [Fitch], as conduct and the disintegration of this marriage, a jury issue was not presented and we would contend that a directed verdict should have been granted.

In response, Valentine maintained that:

> [w]hile they have one set of facts and proof, we had another. The jury chose to believe our facts. It was a classic case of where the jury made a decision and in this case they made it *unanimously*. There was proof on both sides of it. We proved wrongful conduct. We proved loss of affection. We proved the causal connection. We proved loss of love and affection through our client.

(Emphasis added). After hearing argument from both parties, the learned circuit judge denied the JNOV motion.

¶35.	A trial court's denial of a motion for JNOV is reviewed de novo by this Court. ***Poole v. Avara***, 908 So. 2d 716, 726 (Miss. 2005) (citing ***Wilson v. Gen. Motors Acceptance Corp.***, 883 So. 2d 56, 64 (Miss. 2004)). "The trial court must view the evidence *in the light most favorable to the non-moving party* and look only to the *sufficiency*, and not the weight, of that evidence." ***Poole***, 908 So. 2d at 726 (emphasis added). "When determining whether the evidence was *sufficient*, the critical inquiry is whether the evidence is of such quality that *reasonable and fairminded jurors in the exercise of fair and impartial judgment* might reach different conclusions." ***Id***. (citing ***Jesco, Inc. v. Whitehead***, 451 So. 2d 706, 713-14 (Miss. 1984) (Robertson, J., specially concurring)) (emphasis added). *See also **Irby v. Travis***, 935 So. 2d 884, 888-89 (Miss. 2006).

19

¶36. The commonly stated elements of the tort of alienation of affections are "(1) wrongful conduct of the defendant; (2) loss of affection or consortium;[15] and (3) causal connection between such conduct and loss." *Saunders*, 607 So. 2d at 1215. *See also Camp*, 462 So. 2d at 727 ("where a husband [wife] is wrongfully deprived of his [her] rights to the 'services and companionship and consortium of his [her] wife [husband],' he [she] has a cause of action 'against the one who has interfered with his [her] domestic relations.' . . . The husband [wife] might then sue for . . . alienation of affection . . . ."). This Court has recognized that persuasion, enticement, or inducement which causes or contributes to the abandonment is a necessary component of "wrongful conduct." Justice Dickinson recognized in *Children's Medical Group v. Phillips*, 940 So. 2d 931 (Miss. 2006) that in order "to maintain this action it *must* be established that the husband [wife] was *induced* to abandon the wife [husband] by some active interference on the part of the defendant." *Id*. at 934 (quoting *Stanton*, 139 So. at 460) (emphasis added). In recognizing this he identified pre-*Stanton* language requiring persuasion. *See McRae*, 145 Miss. at 205, 110 So. at 508. Thus, to determine whether this

---

[15]Regarding loss of consortium:

> [t]he interest sought to be protected is personal to the wife [husband] and arises out of the marriage relation. She [He] is entitled to society, companionship, love, affection, aid, services, support, sexual relations and the comfort of her husband [his wife] as special rights and duties growing out of the marriage covenant. To these may be added the right to live together in the same house, to eat at the same table, and to participate together in the activities, duties and responsibilities necessary to make a home. All of these are included in the broad term, 'conjugal rights.' The loss of consortium is the loss of any or all of these rights . . . .

*Kirk*, 607 So. 2d at 1224 (citing *Tribble v. Gregory*, 288 So. 2d 13, 16 (Miss. 1974)).

standard was met, following denial of the JNOV motion, this Court must view the evidence "in the light most favorable to the non-moving party[,]" *Poole*, 908 So. 2d at 726, and it must be determined if "reasonable and fairminded jurors in the exercise of fair and impartial judgment might reach different conclusions[,]" *id*., as to that evidence.

¶37. As a preliminary matter, the credibility of a witness is to be judged by the jury. *See Bland*, 735 So. 2d at 419. Viewing the credibility evidence regarding Fitch and Sandra "in the light most favorable," *Poole*, 908 So. 2d at 726, to Valentine, it is clear that a reasonable juror could reject or discount their testimony.

¶38. Under oath and in response to Valentine's first set of interrogatories and requests for admission,[16] Fitch denied both that he fathered K.V. and that he had any sexual relations with Sandra. At the time of this response, K.V. was more than one year old. At trial, Fitch testified that he knew the child was his "a month or two after she was born." At the time he responded under oath to Valentine, Fitch was well aware that K.V. was his child. In spite of this, Fitch denied being K.V.'s father and having any sexual relations with Sandra.

¶39. As to Sandra, when she was pregnant with K.V. in the fall of 1998, during her second trimester of pregnancy, she falsely denied to Valentine that she was having an affair with Fitch. At trial, she stated that her affair with Fitch commenced in late 1997 or early 1998. Furthermore, Sandra subsequently married Fitch, and, as Fitch's wife, her testimony at trial in support of Fitch's position could justifiably be questioned.[17]

---

[16]As well as in his answer.

[17]At trial, Sandra admitted to discussing the lawsuit with Fitch. Regarding potential motive, counsel for Valentine stated, "they eat out of the same trough."

¶40.    Furthermore, viewing the testimony and evidence presented at trial "in the light most favorable," *id*., to Valentine, a reasonable juror could conclude that all elements of the tort of alienation of affections were met.  The "wrongful conduct of the defendant," *Saunders*, 607 So. 2d at 1215, when viewed "in the light most favorable," *Poole*, 908 So. 2d at 726, to Valentine, was satisfied by introduction of evidence supporting a finding that Fitch's acts of persuasion, enticement, or inducement caused or contributed to an adulterous relationship between Fitch and Sandra, which subsequently was admitted.  The judgment of divorce provided that "[t]he evidence presented in open [c]ourt clearly establishes that [Valentine] is entitled to a divorce on the grounds of adultery."[18]  Furthermore, Valentine testified that after K.V. was born he began finding large sums of money throughout the home, which Sandra claimed to have made at work.  The amount of cash he found far exceeded what he had previously observed Sandra earning.  Fitch testified to giving Sandra money between February 1999 and August 1999.  Moreover, Fleming testified that Sandra told her she was given $8,000 by Fitch with which to buy a new Jeep Cherokee.  Soon thereafter, Sandra acquired a new Jeep Cherokee.  Finally, Fleming testified that Sandra told her "that if she did quit [working for Fitch], she was afraid that Mr. Fitch would have [the child] taken away from her."  Valentine testified his marriage failed because Sandra "couldn't resist all the money[,]" and, absent Fitch, his marriage would have remained intact.  This satisfies the additional element of persuasion, enticement, or inducement, when viewed "in the light most favorable," to Valentine.  *Poole*, 908 So. 2d at 726.  The key issue is the "causal connection

_____

[18]Furthermore, Sandra admitted at trial that she committed adultery with Fitch.

22

between such conduct and loss." *Id*. In short, when did the loss of society, companionship, aid, services, support, and the remaining components of loss of affection and consortium occur? *See Kirk*, 607 So. 2d at 1224. Was it before or after Sandra became involved with Fitch? If after, did Fitch's wrongful conduct lead to Sandra's loss of affection or consortium? Again, the testimony must be viewed "in the light most favorable," to Valentine. *Poole*, 908 So. 2d at 726. Even though the marriage may have been "on the rocks," there is no proof that aid, services, support, or the right to live in the same house and eat at the same table had been lost until after the wrongful conduct, even though Sandra asserted that she lost affection for Valentine in January of 1996. Around that time, she allegedly went to the casino, told Valentine that if he did not leave with her their marriage was over, and he did not leave. From that point on, which predated her introduction to Fitch, she claims not to have "care[d] if he went every night, and that's when our marriage was over." However, Valentine testified that, prior to K.V.'s birth, his marriage to Sandra, while not perfect, was "normal." He stated that they had regular sexual relations[19] prior to K.V.'s birth, shared a joint checking account, ate meals together, never separated,[20] and that he loved Sandra. Only after K.V. was born did Valentine begin to notice changes in Sandra. The "loss of affection or consortium," *id*., was unquestionably present.

¶41. After considering the evidence, the jury *unanimously* found for Valentine in the amount of $642,000 in actual damages and, thereafter, for $112,500 in punitive damages. In light of the credibility issues surrounding both Fitch's and Sandra's testimony and the

[19]"Like normal couples."

[20]Sandra further testified that she never filed for divorce from Valentine.

23

standard of review which mandates viewing the evidence "in the light most favorable," to Valentine, "reasonable and fairminded jurors . . . exercis[ing] . . . fair and impartial judgment," could (and unanimously did) find Fitch liable for the tort of alienation of affections. *Id*. Out of respect for the judgments of both the jury and circuit judge, this Court concludes that "[c]onflicting evidence exists which could cause fair-minded jurors to reach different conclusions and thus, granting this motion would have been improper. Therefore, this issue is without merit." *Id*.

**V. Whether the punitive damage award violates due process.**

¶42. Fitch concedes that "[u]nder the current state of jurisprudence in Mississippi, the state has a legitimate interest in protecting the institution of marriage" and the love that forms its foundation. Nonetheless, he argues that such interest ends "when one is punished for engaging in action protected by the Constitution that incidentally may also cause the transfer of affections to one outside the marriage." Therefore, he maintains that "the penal component of the award below . . . offends substantive due process insofar as it sanctions punishment for constitutionally permissive conduct."

¶43. In reply, Valentine first argues that Fitch waived this argument by only generally objecting to punitive damages at trial[21] and not seeking remittance of the punitive damage

_____

[21]Specifically, Valentine argues that Fitch "only objected to the jury instruction on punitive damages to the extent it had a presumption of malice. This presumption was redacted from the instruction. [Fitch] then only made a general objection to punitive damages." While Fitch admits that he "did not urge a First Amendment-based theory of relief against the punitive damage award[,]" he still maintains that he raised due process claims in the circuit court regarding "the 'excessiveness of the verdict' as well as the cumulative errors . . . ."

24

award in post-trial motions. Notwithstanding the procedural bar, Valentine notes that this Court "has recognized punitive damages as proper relief in alienation of affection cases since *Brister v. Dunaway*, 115 So. 36 (Miss. 1928) . . . ." Moreover, he asserts that because adultery constitutes malice, *see Walter*, 228 So. 2d at 598 ("on the issue of adultery with the wife of another . . . malice is presumed."), then Miss. Code Ann. Section 11-1-65(1)(a)[22] is satisfied and "[t]he necessary elements were present for the jury to determine whether or not to grant punitive damages in this case." In total, Valentine maintains that:

> [t]his malicious act of adultery was . . . admitted on the stand. Further, other aggravating circumstances also existed in the case sub judice: i.e., by the continuing acts of adultery occurring two to three times a week during work and occasionally at night over an extended period of time; by a child fathered by [Fitch] during Sandra's marriage to [Valentine]; and by the exorbitant and lavish sums of money, gifts, and benefits which [Fitch] gave to Sandra, his employee, during her marriage to [Valentine].

¶44. As an initial matter, this Court finds that this issue is procedurally barred as no due process challenge to the punitive damage award was raised before the circuit court. *See Johnson*, 929 So. 2d at 407. Procedural bar notwithstanding, this Court has consistently recognized punitive damages as a legitimate form of relief in alienation of affections cases. *See Brister*, 115 So. at 36. Moreover, the punitive damages awarded in the case sub judice

---

[22]Which states "[p]unitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with *actual malice*, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." (Emphasis added).

25

were only a fraction of compensatory damages awarded,[23] hardly rising to the level of gross excess. In total, this issue is without merit.

### VI. Whether this Court should order a remittitur of the award in this case.

¶45. As to damages, Circuit Judge Howorth considered a motion to remit the verdict and concluded:

> [t]he jury's verdict . . . seemed to be a lot of money to me; but if I correctly instructed the jury on the elements of their damages and if the jury was entitled to consider once they arrived at a conclusion about liability, considered the elements that I instructed them on, *I can't second-guess them, don't have the authority to do so, don't want to do so. It's the jury's job to establish the value of the loss and they've done so and I cannot say the amount of the verdict is such to justify the Court granting the motion to remit the verdict.*

(Emphasis added).

¶46. Miss. Code Ann. Section 11-1-55 states, in part:

> [t]he supreme court or any other court of record in a case in which money damages were awarded may overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence.

Miss. Code Ann. Section 11-1-55 (Rev. 2002). This Court has stated that "[a]bsent either of these findings, the trial court abuses its discretion[,]" in ordering a remittitur. ***State Highway Commission of Miss. v. Warren***, 530 So. 2d 704, 707 (Miss. 1988) (quoting ***McIntosh v. Deas***, 501 So. 2d 367, 369-70 (Miss. 1987)).

---

[23]The punitive damage award constituted less than 15% of the total award. The United States Supreme Court has noted that "single-digit multipliers are more likely to comport with due process." ***State Farm Mut. Automobile Ins. Co. v. Campbell***, 538 U.S. 408, 425 (2003).

¶47. Fitch initially admits that "the verdict was based on [Valentine's] testimony concerning the distress caused by the breakup of his marriage and . . . that expert testimony is *not required* to prove such elements." (Emphasis added). Nonetheless, he argues that:

> [Valentine] suffered no economic loss in this case that was quantified with certainty sufficient to support the award . . . . Such a verdict is so obviously excessive as to demonstrate without further argument, bias, passion and prejudice on the part of the jury. The verdict should be set aside . . . .

¶48. Valentine responds that the jury verdict was unanimous and that "[t]he evidence presented by [Valentine] supported the jury's finding that [he] suffered a loss of consortium and affection, and mental and emotional distress because of [Fitch's] wrongful acts." Specifically, he argues that:

> [t]he proof established that [Valentine] suffered not only from the alienation of Sandra's affection, but the damages and losses he sustained as a result of his marital household divided. [Valentine] continues to suffer from the effects of not only losing the affection of Sandra, but also from the effects of losing [K.V.] who he thought was his daughter and who he raised as his daughter and from losing his right to be a full time father of his son, [J.V.], all as a result of [Fitch's] wrongful and intentional acts.

Furthermore, "[i]f there was bias or prejudice, the punitive verdict would have been much larger, particularly when [Fitch's] list of assets reflected aggregate assets of at least [$18,639,750]."

¶49. The trial judge's decision on the denial or acceptance of an additur or remittitur is reviewed by this Court for abuse of discretion. ***Ross-King-Walker, Inc. v. Henson***, 672 So. 2d 1188, 1193-94 (Miss. 1996). The evidence in this case, viewed "in the light most

27

favorable," ***Poole***, 908 So. 2d at 726, to Valentine establishes that Valentine lost: his home;[24] physical custody of J.V.;[25] his marriage and the society, companionship, aid, services, support and other components of affection and consortium attached thereto; and K.V., the child he believed to be, and raised as, his daughter. As the circuit judge found, the jury establishes the value of the loss suffered by Valentine. They determined he was entitled to $642,000 in actual damages and $112,500 in punitive damages, and the judge concluded that the amount of the verdict did not justify remittitur. There being no evidence that either "(1) the jury or trier of fact was influenced by bias, prejudice, or passion, or (2) the . . . damages were contrary to the overwhelming weight of the evidence[,]" ***Entergy Miss., Inc. v. Bolden***, 854 So. 2d 1051, 1058 (Miss. 2003), this Court finds that the circuit court did not abuse its discretion in denying remittitur and the jury verdict should be affirmed.

## CONCLUSION

¶50. Based upon the aforementioned analysis, this Court affirms the judgment of the Circuit Court of Marshall County entered against Fitch and in favor of Valentine "for the total sum of $754,500 and interest thereon in the amount of 8% per annum and all costs . . . ."

¶51. **AFFIRMED**.

**SMITH, C.J., WALLER AND COBB P.JJ., DIAZ AND CARLSON, JJ., CONCUR. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DICKINSON, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION**

---

[24]He sold his interest in the house to Sandra "because [he] wanted a place for [J.V.] to live."

[25]He gave Sandra physical custody of J.V. because "[he] loved [K.V.]. I was not going to split them up and do that to him."

28

**JOINED IN PART BY GRAVES, J. EASLEY, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**DICKINSON, JUSTICE, SPECIALLY CONCURRING:**

¶52.    In my view, Mississippi should abandon the five other states which continue to fully recognize the antiquated common law tort of alienation of affections, and join the forty-two states who refuse to do so. As well said by the Iowa Supreme Court a quarter of a century ago, "[t]here is inherent and fatal contradiction in the term 'alienation of affections.' The alienation belies the affection." *Funderman v. Mickelson*, 304 N.W.2d 790, 791 (Iowa 1981). Nevertheless, I have been unsuccessful in persuading the benevolent majority which holds that the ancient and infirm cause of action shall continue to breathe in Mississippi. That said, I shall respect the majority's decision, and apply the law to alienation of affections cases which find their way here, including the case before us today. First, however, I shall state my case for abolition of the cause of action.

*Evolution of the alienation of affections cause of action*

¶53.    The tort called alienation of affections originated in the English common law, when wives were considered their husbands' property. A third party who actively interfered with a marriage by persuading a wife to leave her husband was considered to have deprived the husband of his property. A brief overview of the development of common law alienation actions is in order to explain and provide an historical backdrop for the discussion to come.

¶54.    In order to maintain pure bloodlines and discourage adultery, Teutonic tribes required a wife's lover to compensate the husband for his wife's infidelity, allowing the husband to buy a new wife and ensure the legitimacy of his offspring. *Hoye v. Hoye*, 824 S.W.2d 422,

29

423-24 (1992) (citing Lippman, *The Breakdown of Consortium*, 30 Colum. L. Rev. 651, 655 (1930)). The Anglo-Saxons later allowed actions for marital interference on the premise that wives were valuable servants to their husbands. *Helsel v. Noellsch*, 107 S.W.3d 231(Mo. 2003). The action was analogous to a master's claim "against one who enticed away his servant, in whose services the master held a quasi-property interest." *O'Neil v. Schuckardt*, 733 P.2d 693, 696 (Idaho 1986). Thus, in keeping with this belief, a husband could "vindicate" his loss in the marital relationship through an action for alienation of affections, but a wife was not afforded the same right. *Helsel*, 107 S.W.3d at 232.

¶55.    Two centuries ago, in *Hutcheson v. Peck*, 5 Johns. 196 (N.Y. 1809), the Supreme Court of Judicature of New York applied the common law tort to an action by a husband who sued his wife's father for attempting to alienate his wife's affection. Although at first agreeable to his daughter's marriage, the father-in-law began to question the Plaintiff's ability to provide for his daughter, and changed his mind. He threatened his daughter's husband, going so far as to "strike" him, and then took his daughter into his home and threatened that, if she returned to her husband, he would not support them. In analyzing the claim, the court stated that "[i]f it was the duty of the wife to return to her husband, the defendant did an unlawful act by persuading her to violate that duty. If the wife was unjustifiable in abandoning the plaintiff, the defendant is responsible for having *enticed* and *persuaded* her to abandon him."*Id*. at 205  (emphasis added.). The court went on to state that, had the defendant "not been instrumental in procuring his daughter to live apart from her husband, and had he gone no further than to receive and support her," the plaintiff would have no recovery. *Id*. at 206. The court then stated, "[v]ery different, however, will be the

30

conclusion, when the parent unlawfully produces the separation by sowing the seeds of discord and hatred; thereby poisoning the sources of domestic harmony and enjoyment." *Id*.

¶56.    In *Wensmore v. Greenban*, (Wiles 581) (Wiles' English King's Bench and Common Pleas Reports), the ancient English court declared, "[t]o be sure, it must be an unlawful *procuring* . . . and by means of [insinuations] the defendant [must have] *persuaded* the plaintiff's wife to do an unlawful act . . . ." (Emphasis added).

¶57.    When Mississippi became one of the United States, it recognized and adopted most of the English common law.  Thus, the civil cause of action for alienation of affections traveled with our ancestors from England to Mississippi.  Over the past two hundred years, however, the cause of action has fallen into disfavor for several reasons.  In the late nineteenth and early twentieth centuries, the Married Women's Property Acts were passed, giving women the same rights to own property as men.  *Hoye*, 824 S.W.2d at 424 (citing Comment, *Alienation of Affections: Flourishing Anachronism*, 13 Wake Forest L. Rev. 585, 588 (1977)).  This shift in the perception of a wife's role in the marriage forced the courts to consider the continued viability of alienations actions.  *Hoye*, 824 S.W.2d at 424.  But instead of allowing the tort – along with its wife-as-chattel premise – to fade away, some courts began to justify alienation of affection actions as a means to preserve marriages and discourage interference by third-parties.  *Id.  See also O'Neil*, 733 P.2d at 696.  While the rationale for the action changed, the tort's elements (in most states) remained unaltered[26] despite the new focus on marital harmony.  *Hoye*, 824 S.W.2d at 425.

---

[26]As will be discussed below, the tort's elements changed in Mississippi by this Court's loose interpretation of previous cases.

¶58. For example, consent was historically prohibited as a defense to alienation actions "based on the legal inferiority of the wife who was deemed incapable of consenting to the injury of her superior, her husband." *Id.* (citing H. Clark, *The Law of Domestic Relations in the United States*, § 4.2, p. 267 (1987)). And even though the cause of action has supposedly moved beyond those outdated roots, consent remains a prohibited defense today, *id.*, as today's case demonstrates. As one commentator noted, "[t]he idea that one spouse can recover for an act the other spouse has willingly consented to is perhaps better suited to an era that regarded one spouse as the property of another." Prosser and Keeton, *The Law of Torts*, § 124 at 917 (5th ed. 1984).

¶59. The Kentucky Supreme Court, quoting Justice Holmes, described the unfortunate rise of the legal fiction buttressing the common law tort of alienation of affections:

> [A] common phenomenon . . . familiar to the students of history, is this. The customs, beliefs or needs of a primitive time establish a rule or a formula. In the course of centuries the custom, belief, or necessity, disappears, but the rule remains. The reason which gave rise to the rule has been forgotten, and ingenious minds set themselves to inquire how it is to be accounted for. Some ground of policy is thought of, which seems to explain it and to reconcile it with the present state of things and then the rule adapts itself to the new reasons which have been found for it, and enters a new career. The old form receives a new content and in time even the form modifies itself to fit the meaning which it has received.

*Hoye*, 824 S.W.2d at 425 (quoting Lippman, *supra*, at 672). As the Missouri Supreme Court astutely noted, "When the reason for a rule of law disappears, so too should the rule." *Helsel*, 107 S.W.3d at 233. In Mississippi, though, the legal fiction that the common law tort of alienation of affections preserves a spouse's right to the mind and body of a partner continues to this day, only now it is masked as the means to stabilize the marital union.

32

*Right to abolish common law actions*

¶60.     Because I favor strict observance of the constitutional separation of powers, reserving unto the Legislature the prerogative to legislate, and claiming for this Court the power and duty to attend to all things judicial, I feel somewhat obligated to justify my preference that this Court, rather than the Legislature, abolish the tort.

¶61.     It appears that this Court first recognized the tort of alienation of affections in **Brister v. Dunaway**, 149 Miss. 5, 115 So. 36 (1927).  Notably, the Mississippi Legislature has never codified any of the so-called "heart balm torts," including alienation of affections, and the actions remain exclusively creatures of the common law.

¶62.     In **Saunders v. Alford**, 607 So. 2d 1214, 1219 (Miss. 1992), this Court, recognizing the obsolete nature of another of the common law "heart balm" torts, abolished criminal conversation.  In explaining the constitutional power of the Court to abolish the cause of action, this Court stated that "the creation of common law is not a one-way street. . . . What the court gives it can take away.  This Court faces no constitutional impediment to ceasing to recognize criminal conversation as a viable tort." *Id.*  *See also* **Funderman**, 304 N.W.2d at 793 ("Of course it is our duty to monitor and interpret the common law, and to abandon antiquated doctrines and concepts.  The genius of the common law is its flexibility and capacity for growth and adaption." (Citations omitted)); **Russo v. Sutton**, 422 S.E.2d 750, 753 (S.C. 1992) ("The common law changes when necessary to serve the needs of the people.").  Thus, because the common law is a creature of the courts, English and American, this Court and other courts are free to change it at will, recognizing that the legislative bodies

33

of the various states are also free to enact into statutory law any provision of the common law they think appropriate.

¶63.    A woman is not property, and her decision to engage in and consent to extra-marital affairs – although abhorrent to the majority (and to me) – should not be relegated to the musings of an inferior spouse, incapable of making such decisions.

*Spousal affection is incapable of theft*

¶64.    The alienation of affections cause of action has never sufficiently separated from its property-based origins, and the tort is continued because "spousal affection" is characterized as "property" capable of theft. *Funderman*, 304 N.W.2d at 794.  However, that premise is simply illogical.  "To posit that one person possesses rights to the feelings of another is an anachronism." *Hoye*, 824 S.W.2d at 426.  Even though courts today do not call the alienated affection "property" or "a possession," that is how it is treated, just as it was when courts created the cause of action to compensate husbands for the loss of their wives' "services." In the end, the successful plaintiff engages in what is essentially a "sale" of his or her spouse's affections. *Wyman v. Wallace*, 615 P.2d 452, 455 (Wash. 1980).

¶65.    Additionally, "theft" implies the taking of property from an unwilling owner by an outsider.  However, the fact is that actions for alienation of affections arise from the willing participation of one spouse.  While the tort purportedly exists to discourage third-parties from disturbing the martial relation, in reality the marriage is unlikely to weaken without one spouse actively consenting to the "wrongful interference." *O'Neil*, 733 P.2d at 698. "Human experience is that the affections of persons who are devoted and faithful are not susceptible

34

to larceny no matter how cunning or stealthful." *Funderman*, 304 N.W.2d at 791. *See also Russo*, 422 S.E.2d at 752; *Wyman*, 615 P.2d at 455.

¶66. Importantly, I do not advocate for the abolition of this tort because I feel defendants in such suits deserve protection, or because I view promiscuity as harmless. I merely find the foundation for such suits – that someone should recover for an injury to "property" which they cannot own – completely erroneous. *See Funderman*, 304 N.W.2d at 794.

*No evidence the tort deters wrongful interference with or preserves marriage*

¶67. As the Washington Supreme Court noted when abolishing the tort of alienation of affections, "[t]he underlying assumption of preserving marital harmony is erroneous." *Wyman*, 615 P.2d at 455. The tort is inherently unplanned, especially where sexual activity is involved, so the idea that the parties would contemplate the possibility of a lawsuit and be deterred is unrealistic. *O'Neil*, 733 P.2d at 698 The truth remains that a spouse inclined to engage in an extramarital affair will do so, and even if "a would-be paramour would be thereby dissuaded [by the threat of suit], a substitute is likely to be readily found." *Funderman*, 304 N.W.2d at 792.

¶68. The theory that alienation actions must be retained as a means of preserving marriages and protecting families must fail for lack of support. While an admirable sentiment, these suits inevitably do more to hurt families than to help them. In my view, when a marriage has crashed and burned, the law should not provide an imprimatur to fan the coals of anger and resentment, extending further into the future the time when healing can begin. This is particularly true where children are involved. Enough difficulty exists already in the development of a civil relationship among divorced parents and the children of the marriage.

35

*Cause of action is primarily punitive and brought to gain revenge*

¶69. Despite the fact that an action for alienation of affections is a civil suit and theoretically compensatory, the true nature of the claim is punitive. "The third party is seen as a malicious seducer wreaking havoc upon the harmonious marital couple. These common law actions thus reason that the third-party must be punished for his [or her] misdeeds by payment to the aggrieved spouse." *Hoye*, 824 S.W.2d at 425.

¶70. Undeniably, the primary motives in bringing an action for alienation of affections are to gain revenge on the unfaithful spouse and the defendant and to force outrageous settlements. *O'Neil*, 733 P.2d at 698. Alienation of affection claims have become prime tools for extortion or blackmail. *Russo*, 422 S.E.2d at 753; *Wyman*, 615 P.2d at 455. Such vexatious lawsuits can make contentious divorce proceedings even more bilious. *O'Neil*, 733 P.2d at 698. The action can also rearrange the marital assets, making it difficult for a court to properly assess the needs and abilities of the individual spouses. *Id.* at 697. These suits are never used to achieve reconciliation or preserve the marriage; rather, they are fueled by vindictiveness and a desire to destroy reputations and relationships. *Helsel*, 107 S.W.3d at 223.

*Injuries to parties' reputations and dignity*

¶71. No party involved in an action for alienation of affections emerges unscathed. While the harm to the defendant and unfaithful spouse is clear, "the action [also] diminishes the plaintiff's dignity and injuries his [or her] own reputation through the process of seeking money damages." *O'Neil*, 733 P.2d at 697. The intimate details of the marriage, and its

36

breakdown, are revealed for all to see as the parties attempt to assassinate the character of their adversaries. *Helsel*, 107 S.W.3d at 223; *Russo*, 422 S.E.2d at 753.

¶72.    Often lost in this bitter fight is the effect the suit can have on children of the marriage. Even beyond the mere exposure to the airing of their parents' dirty laundry, children can be required to testify for one parent or another in open court. *O'Neil*, 733 P.2d at 698. *See also Funderman*, 304 N.W.2d at 791 (detailing such testimony). Clearly, any injuries that might have been caused by the wrongful conduct are exacerbated by alienation of affections actions.

*Difficulty of juries to properly evaluate alienation actions*

¶73.    Alienation of affections cases present a particularly difficult challenge for juries. As the Iowa Supreme Court observed,

> [o]ur system of establishing facts, however, has a strong, sometimes it seems an irresistible, tendency to break down in alienation cases. This is because of the incendiary effect of the usual evidence in such cases. Under the established theory of recovery, the jury should first undertake to decide which came first, the marriage breakdown or the misconduct. But juries necessarily face the first determination after learning of conduct of which they strongly disapprove and which society condemns.

*Funderman*, 304 N.W.2d at 791.

¶74.    The element of "inducement" often proves perplexing, as the factfinder must determine whether the defendant or the alienated spouse was primarily responsible for the other spouse straying. The Idaho Supreme Court cited a case to illustrate the dilemma where the plaintiff and spouse were separated, the spouse willingly engaged in an affair, and yet the jury still found for the plaintiff. *O'Neil*, 733 P.2d at 698 (citing *Sebastian v. Klutz*, 170 S.E.2d 104 (N.C. Ct. App. 1969)). The jury in this case fell into the same trap. The majority

37

accurately points out that there was no evidence that Fitch "induced" Valentine's estranged wife to engage in an illicit affair with him. Nevertheless, the jury awarded Valentine $754,500, plus interest, for his alleged loss.

¶75. The awarding of damages presents another distinct problem in these actions, as no clear standards for compensating the plaintiff exist. *Wyman*, 615 P.2d at 455. This opens the door for quasi-punitive damage awards, disguised as actual damages, which are usually tainted by passion and prejudice. *O'Neil*, 733 P.2d at 698. Of course, I can hardly blame jurors for struggling with this cause of action. The theory of recovery, itself, is flawed. *Funderman*, 304 N.W.2d at 791.

*Abolition will have no effect on right to recover for loss of consortium*

¶76. Abolition of the common law tort of alienation of affections will in no way restrict the right to recover for loss of consortium. "The right to recover for loss of consortium is a factor in assessing damages when the underlying liability has been established in a personal injury suit. Renunciation of the right to recover for alienation proceeds from the belief there is no basis for the underlying liability." *Id.* at 794. Given the specific attributes of an alienation action and the right to recover for loss of consortium, it is not inconsistent to abolish the former and continue to recognize the latter. *Id.*

*Comparison with actions for tortious interference with a contractual relationship is misplaced*

¶77. A claim of tortious interference with a contractual relationship is not comparable to a claim of alienation of affections. In contract suits, the aggrieved party can sue both the interferer and the other party to the contract. However, in alienation actions, the "other

38

party" to the "contract" is the spouse (whose affection was allegedly alienated from the plaintiff) who is not subject to suit, as in true contract cases. *Hoye*, 824 S.W.2d at 426. As the Kentucky Supreme Court pointed out, "[t]his logical asymmetry has prompted the majority of jurisdictions to eliminate these marital torts." *Id.*

*A majority of states have abolished the common-law action*

¶78. Despite the majority's assertions to the contrary, there is simply no evidence that the alienation of affections cause of action protects marriages. *O'Neil*, 733 P.2d at 698. "In fact, once suit has been brought, it notifies the public that the marriage is unstable, embarrasses the spouses and their children, and adds more tension to the family relationship." *Id.* The majority of states have discarded this fictional rationale for preserving the common law tort of alienation of affections, and we should follow suit.

¶79. The following twenty-five states and the District of Columbia have legislatively abolished the common law tort of alienation of affections: Alabama, Ala. Code § 6-5-331 (1975); Arizona, Ariz. Rev. Stat. § 25-341 (1956); Arkansas, Ark. Code Ann. § 16-118-106 (1989); California, Cal. Civ. Code § 43.5 (1982); Colorado, Colo. Rev. Stat. § 13-20-202 (1973); Connecticut, Conn. Gen. Stat. Ann. § 52-572b (1984); District of Columbia, D.C. Code Ann. § 16-923 (1981); Georgia, Ga. Code Ann. § 51-1-17 (1979); Indiana, Ind. Code Ann. § 34-12-2-1 (1998); Kansas, Kan. Stat. Ann. § 23-208 (1982); Maine, Me. Rev. Stat. Ann. tit. 14, § 301 (1995); Maryland, Md. Code Ann., Fam. Law § 3-103 (1984); Massachusetts, Mass. Gen. Laws Ann. ch. 207, § 47B (1985); Michigan, Mich. Comp. Laws Ann. § 600.2901 (1961); Minnesota, Minn. Stat. Ann. § 553.01 (1978); Montana, Mont. Code Ann. § 27-1-601 (1983); Nebraska, Neb. Rev. Stat. § 25-21,188 (1986); Nevada, Nev.

Rev. Stat. 41.380 (1979); <u>North Dakota</u>, N.D. Cent. Code § 14-02-06 (1983); <u>Oregon</u>, Or. Rev. Stat. § 31.980 (2004); <u>Rhode Island</u>, R.I. Gen. Laws § 9-1-42 (1997); <u>Tennessee</u>, Tenn. Code Ann. § 36-3-701 (1989); <u>Texas</u>, Tex. Fam. Code Ann. § 1.107 (1997); <u>Virginia</u>, Va. Code Ann. § 8.01-220 (1977); <u>West Virginia</u>, W. Va. Code § 56-3-2a (1969); and <u>Wisconsin</u>, Wis. Stat. Ann. § 768.01 (1979).

¶80.    The following six states have judicially abolished the common law tort: <u>Idaho</u>, in ***O'Neil***, 733 P.2d at 698; <u>Iowa</u>, in ***Fundermann***, 304 N.W.2d at 791; <u>Kentucky</u>, in ***Hoye***, 824 S.W.2d at 423; <u>Missouri</u>, in ***Helsel***, 107 S.W.3d at 233; <u>South Carolina</u>, in ***Russo***, 422 S.E.2d at 753; and <u>Washington</u>, in ***Wyman***, 615 P.2d at 455.

¶81.    Thus, thirty-one states have completely abolished the common law tort of alienation of affections.  But it doesn't stop there.  The following eight states have legislatively abolished all alienation of affections suits for money damages: <u>Delaware</u>, Del. Code Ann. tit. 10, § 3924 (1974); <u>Florida</u>, Fla. Stat. Ann. § 771.01 (1964); <u>New Hampshire</u>, N.H. Rev. Stat. Ann. § 460:2 (1981); <u>New Jersey</u>, N.J. Stat. Ann. § 2A:23-1 (1935); <u>New York</u>, N.Y. Civ. Rights Law § 80-a (1965); <u>Ohio</u>, Ohio Rev. Code Ann. § 2305.29 (1990); <u>Vermont</u>, Vt. Stat. Ann. tit. 15, § 1001 (1973); and <u>Wyoming</u>, Wyo. Stat. Ann. § 1-23-101 (1977).

¶82.    <u>Oklahoma</u> has abolished the tort when a spouse of sound mind/legal age is involved. Okla. Stat. tit. 76, § 8.1 (1976) <u>Pennsylvania</u> has abolished the tort except in those cases where the defendant is the parent or sibling of the plaintiff's spouse Pa. Stat. Ann. tit. 23, § 1901 (1990).  <u>Illinois</u> only permits actual damages to be recovered in alienation of affection actions 740 Ill. Comp. Stat. Ann. 5/2 (1990).  <u>Alaska</u> and <u>Louisiana</u> have never even

recognized the tort.  *See Moulin v. Monteleone*, 115 So. 447, 451 (La. 1927), *overruled in part on other grounds by 9 to 5 Fashions v. Spurney*, 538 So. 2d 228, 234 (La. 1989).

¶83.   Only six states continue to fully recognize the common law tort of alienation of affections: Hawaii, Mississippi, New Mexico, North Carolina, South Dakota, and Utah.  It is, in my view, time that Mississippi's name be removed from this ever-dwindling list and recognize what so many other jurisdictions have long since realized: alienation of affections suits have outlived any relevance or usefulness they may have once possessed.  The Court recognized this truth with respect to the tort of criminal conversation, and we abolished that cause of action accordingly.  *Saunders*, 607 So. 2d at 1219.  The same course of action should be followed here, and this Court should likewise abolish the common law cause of action for alienation of affections.

## II.

¶84.   Having failed to gain agreement from a majority of Justices on elimination of the cause of action, I must now analyze the case before us.  Despite my view that the cause of action for alienation of affections should be eliminated in Mississippi, a majority of this Court wishes it to remain viable.  Since my oath of office requires me to follow the law as it exists, not as I think it should be, I cannot deprive the plaintiff of my vote simply because my personal view is that the law should be changed.  A vote to dissent would be justified in this case only if I conclude that the existing law has been improperly applied.  In my view, Justice Randolph's analysis of the law and his application of the law to this case is exactly correct.  Indeed, I am grateful that Justice Randolph has taken this opportunity to clarify an area of the law which, because of previous cases handed down by this Court, has become

41

muddled.  The majority clearly sets forth the requirement that alienation of affections claims may be maintained only where the defendant can be shown to have committed a wrongful act which served to induce or entice a spouse to abandon the marriage relationship.  For these reasons, with respect to the majority's disposition of this case under our current law, I concur.

¶85.  I commend the majority for clarification of this issue.

**GRAVES, J., JOINS THIS OPINION IN PART**.

**EASLEY, JUSTICE, DISSENTING:**

¶86.  On appeal, Jerry Fitch, Jr. (Fitch) raised numerous assignments of error: (1) whether the tort of alienation of affections should be abolished; (2) whether the trial court erred in allowing Johnny Valentine (Valentine) to use unsworn pleadings to impeachment Fitch; (3) whether the trial court erred in granting Valentine's jury instructions, P-5 and P-8; (4) whether the trial court erred in denying Fitch's jury instruction, D-8; (5) whether the compensatory award in this case was contrary to the weight of the evidence; (6) whether the compensatory award in the case was contrary to the weight of credible evidence and the product of bias, passion, and prejudice; (7) whether the punitive damage award in this case violates due process; and (8) whether the trial court erred in denying a substantial remittur.

**I.    Alienation of Affections**.

¶87.  While the Valentines' marriage was unquestionably not a "shining example" of marriage, and divorce is unfortunately increasingly prevalent in our society, I agree that the Court should decline the invitation to abolish the tort of alienation of affections.  Alienation of affections  is the only avenue available to provide redress for a spouse who has suffered

42

loss and injury to his or her marital relationship against the third party who induced the husband or wife to abandon the marriage and/or affections due to his or her active, direct, and intentional interference with the marriage.

¶88.   In *Camp v. Roberts*, 462 So. 2d 726, 727 (Miss. 1985), this Court held:

> [W]here a husband [wife] is wrongfully deprived of his rights to the "services and companionship and consortium of his [her] wife [husband]," he [she] has a cause of action "against one who has interfered with his [her] domestic relations."

*Camp*, 462 So. 2d at 727 (citing *Walter v. Wilson*, 228 So. 2d 597, 598 (Miss. 1969), *overruled in part on other grounds, Saunders v. Alford*, 607 So. 2d 1214, 1219 (Miss. 1992)).  The tort of alienation of affections is equally applicable to women as men as to avoid any archaic notion that a wife is the property of her husband.  *See Kirk v. Koch*, 607 So. 2d 1220, 1224 (Miss. 1992).

¶89.   Chief Justice Smith, then Justice Smith, authored an excellent special concurring opinion in *Bland*, which clearly explained the justification and need to continue to recognize alienation of affections as a viable tort, stating:

> [W]here the proof is so great in support of an action for alienation of affections, we must ask the following questions.  Should an individual be allowed to intrude upon a marriage to such an extent as to cause it to come to an end?  Does a spouse have a valuable interest in a marriage that is worthy of protection from the intruding third party? In my view, the answer to both questions is in the affirmative.  ***The traditional family is under such attack both locally and nationally these days that this Court should not retreat now from the sound view of the tort of alienation of affections espoused by this Court in Saunders as entitling a spouse to "protection of the love, society, companionship, and comfort that form the foundation of a marriage."*** *Saunders v. Alford*, 607 So. 2d 1214, 1215 (Miss. 1992) (quoting *Norton v. Macfarlane*, 818 P.2d 8, 12 (Utah 1991)); *see also Horner v. Byrnett*, 511 S.E.2d 342 (N.C. Ct. App.1999).  I do not believe that under the compelling facts of this particular case this Court should hold that the doctrine of

43

alienation of affections has outlived its usefulness as a deterrent protecting the martial [sic] relationship of a husband and wife in cases where the facts clearly warrant. 607 So. 2d at 1219.

*Bland*, 735 So. 2d at 421-422 (Smith, J., specially concurring) (emphasis added).

## II.     Judgment Not Withstanding the Verdict (JNOV).

¶90.    The required elements of an alienation of affections lawsuit include: (1) wrongful conduct of the defendant, (2) loss of affection or consortium, and (3) a causal connection between the conduct and the loss. *Bland v. Hill*, 735 So. 2d 414, 417 (Miss. 1999) (emphasis added). In *Bland*, this Court held that "the purpose of a cause of action for alienation of affections is the 'protection of the love, society, companionship, and comfort that form the foundation of a marriage . . .'" *Bland*, 735 So. 2d at 417 (quoting *Saunders*, 607 So. 2d at 1215).

¶91.    The "wrongful conduct" required to maintain an action for the tort of alienation of affections is the *direct and intentional interference with the marriage relationship* by the defendant and an *inducement to abandon the spouse by some active interference by the defendant*. *See Children's Medical Group v. Phillips*, 940 So. 2d 931, 934 (Miss. 2006); *Stanton v. Cox*, 162 Miss. 438, 450, 139 So. 458, 460 (1932). In *Stanton*, 139 So. at 460, this Court held:

> "In order to sustain an action for the alienation of the husband's [wife's] affections it must appear, in addition to the fact of alienation or the fact of the husband's [wife's] infatuation for the defendant, that *there had been a direct interference on the defendant's part, sufficient to satisfy the jury that the alienation was caused by the defendant*, and the burden of proof is on the plaintiff to show such interference." 15 Am. & Eng. Ency. of Law, p. 865. Again, on page 866, it is said: "*But to maintain this action it must be established that the husband [wife] was induced to abandon the wife [husband] by some active interference on the part of the defendant*." In 3

44

Elliott on Evidence, section 1643, it is said: "To entitle the plaintiff to recover in an action for alienating affections, the burden of proof is upon the plaintiff, and the plaintiff must show that there was a direct interference upon the part of the defendant that not only was there infatuation of the husband or wife for the defendant, but that the defendant by wrongful act was the cause of it."

(Emphasis added). *See also Kirk,* 607 So. 2d at 1223; *Martin v. Ill. Cent. R.R. Co.*, 246 Miss. 102, 110-11, 149 So. 2d 344, 348 (1963). In *Kirk*, this Court stated that the defendant must "directly and intentionally [interfere] with" plaintiff's marriage, thereby *inducing* the alienation of affections of the plaintiff's spouse. *Kirk*, 607 So. 2d at 1223 (emphasis added).

¶92. The majority correctly recognizes that inducement is a specifically required element to establish alienation of affections, rather than alienation of affections being established solely from the fact that an affair or sexual relationship occurred. However, the majority's reasoning remains fatally flawed. The majority focuses its reasoning to establish inducement from the undisputed fact that Fitch is a wealthy man, and Sandra could not resist his money. The majority misses the point that there must be established some "wrongful conduct" on the part of Fitch that amounted to the direct and intentional interference with the marriage relationship and resulted in the inducement of Sandra to abandon Valentine by some active interference on the part of Fitch. Sandra testified that Fitch did not ask her to leave Valentine, and she was the initiator of the eventual relationship.

¶93. Here, the majority bases the inducement on *Sandra's* alleged inability to resist Fitch's money and the fact that Sandra had a lot of money in cash when she worked for Fitch. However, both Sandra and Fitch testified that Fitch did not give Sandra any money above and beyond what she earned in her salary from working for Fitch Oil Company and in commissions from the sale of real estate for Fitch Realty. According to the record, Sandra

45

began working at Fitch Oil Company sometime in 1997. Sandra testified that her relationship with Fitch did not start until sometime in the spring of 1998. She testified that she believed that she had worked there approximately sixteen months before *she initiated* flirtation and the affair with Fitch. Fleming, who worked as the bookkeeper for Fitch Oil Company testified as to how Sandra was paid her salary. Fleming verified that Fitch paid all his employees in cash.

¶94. Fitch testified regarding the money he gave to Sandra before they were married. He stated that Sandra worked out of Fitch Oil Company, but she also worked in Fitch Realty as a realtor. Fitch stated that Sandra, like all of his employees, was paid in cash for her weekly salary plus commissions on what she sold. According to Fitch's testimony, he never gave Sandra any extravagant gifts nor took any trips with her. He further denied that he ever gave Sandra $8,000 in cash to purchase a Jeep Cherokee. Fitch testified that he did not recall giving Sandra any money over and above her salary and commissions.

¶95. Further, Sandra and Fitch both denied that Fitch had ever made any threats against Sandra that he would take her child away from her. Sandra also denied any physical threats from Fitch. Sandra testified that Fitch never asked her to leave Valentine. Sandra subsequently married Fitch after she divorced Valentine, and she was still married to Fitch at the time of the trial. Further, Sandra met Valentine under similar circumstances.

¶96. Prior to trial, Valentine filed a motion in limine to prevent Fitch from introducing any evidence that Valentine and his former wife, Sandra, engaged in and participated in a lengthy adulterous relationship prior to their marriage while Sandra was still married to a prior husband, Tracey Hughey. After Sandra's divorce from her husband, Hughey, she married

46

Valentine. The trial court granted the motion in limine to exclude the testimony regarding Valentine's adulterous affair with Sandra.

¶97. As will be discussed in greater detail below, Sandra testified that she was the initiator of the relationship with Fitch. This fact is completely ignored in its reasoning by the majority which acknowledges that the spouse must have been induced to abandon the marriage. It is hard to imagine how Sandra was the one induced when she testified that she pursued Fitch, who was married at the time, and she was the initiator of their eventual relationship.

¶98. Fitch made a post-trial motion for JNOV. In Fitch's reply memorandum, Fitch contended that "[the] plaintiff was unable to show that [the] defendant's direct interference with the marital relationship caused the alienation of the plaintiff's affections." Fitch stated that "the plaintiff's theory of the case" was that "Sandra [Valentine Fitch] was attracted to [the] defendant's money." Fitch further noted that the evidence of adultery satisfied the first prong of the inquiry, however, "the plaintiff was unable to prove loss of affection as a result of that conduct." The trial court subsequently entered its order denying Fitch's motion for JNOV.

¶99. Pursuant to M.R.C.P. 50(b), "a party may file a motion to have the verdict and any judgment entered thereon set aside," no "later than ten days after entry of judgment in accordance with a verdict." M.R.C.P. 50(b). A motion for JNOV challenges the legal sufficiency of the evidence. *McFarland v. Entergy Miss., Inc*., 919 So. 2d 894, 904 (Miss. 2005); *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993). "[T]his Court properly reviews the ruling on the last occasion the challenge was made in the trial court." *McClain*, 625 So. 2d at 778. Here, this occurred when the trial court denied Fitch's motion for JNOV. In

47

***White v. Stewman***, 932 So. 2d 27, 32-33 (Miss. 2006), this Court recently provided an

excellent analysis of what occurs when a motion for JNOV is made pursuant to M.R.C.P.

50(b), stating:

> Rule 50(b) allows the court to reserve the decision on this critical
> question of law until after the case has been submitted to the jury and the jury
> has reached a verdict or has informed the judge of its inability to agree on a
> verdict. Wright & Miller, Federal Practice and Procedure: Civil 2d § 2521, p.
> 241. "If the court decides that the initial motion for judgment as a matter of
> law should have been granted, it may set aside the verdict of the jury and enter
> a judgment as a matter of law. . . . Thus the rule gives the trial court a last
> chance to order the judgment that the law requires." ***Id***., pp. 241-42.

> When a proper post-verdict motion for a JNOV has been made, the
> court has three options:

>> First, of course, it may deny the motion and enter judgment on
>> the verdict. Alternatively, it may grant the motion and order
>> judgment for the moving party. Either of these actions results
>> in a final appealable judgment. Third, the court may think the
>> motion well taken but the defect in the proof possibly
>> remediable and thus order a new trial rather than judgment as a
>> matter of law. An order granting a new trial is interlocutory in
>> nature and generally not appealable.

> Wright & Miller, Federal Practice and Procedure: Civil 2d § 2540, p. 366-67.
> (See also Miss. R. Civ. P. 50, cmt.).

> The standard of review for the denial of a motion for JNOV is well settled:

>> A motion for a JNOV tests the legal sufficiency of the evidence
>> supporting the verdict, not the weight of the evidence. ***Tharp v.***
>> ***Bunge Corp***., 641 So. 2d 20, 23 (Miss. 1994). It asks the court
>> to hold, as a matter of law, that the verdict may not stand.
>> ***Goodwin v. Derryberry Co***., 553 So. 2d 40, 42 (Miss. 1989)
>> (citing ***Stubblefield v. Jesco, Inc***., 464 So. 2d 47, 54 (Miss.
>> 1984)). When a motion for JNOV is made, the trial court must
>> consider all of the evidence-not just evidence which supports the
>> non-movant's case-in the light most favorable to the party
>> opposed to the motion. If the facts and inferences so considered
>> point so overwhelmingly in favor of the movant that reasonable

48

> jurors could not have arrived at a contrary verdict, granting the motion is required. ***Janssen Pharmaceutica, Inc. v. Bailey***, 878 So. 2d 31, 54 (Miss. 2004).

*McFarland*, 919 So. 2d at 899-900 (quoting ***White v. Yellow Freight System, Inc***., 905 So. 2d 506, 510 (Miss. 2004)).

¶100. Sandra testified that she met Valentine in 1989 when she was married to someone else. They were married years later in 1993. Sandra went to work for Fitch Oil Company sometime in 1997. According to Sandra's testimony, she was the initiator of the relationship with Fitch. She testified that she was the one who pursued Fitch and flirted with him. She testified that she was attracted to Fitch and fell in love with him. Eventually, Sandra and Fitch began a relationship sometime in 1998 that eventually became sexual.

¶101. Sandra testified that her marriage to Valentine was already over before the relationship began. According to Sandra's testimony, her marriage to Valentine was over in her mind in 1996, before she ever met Fitch in 1997. She testified that Valentine spent his money and time gambling and hanging out with his buddies rather than spending any time with her. She stated that Valentine routinely came home drunk, and they had no communication with each other. Sandra testified that after she stopped hanging out with Valentine at his buddy's house sometime in 1995 or 1996, she rarely saw him. Sandra testified that she would go to Valentine's buddy's house or the casinos and try to get him to come home. Sandra testified that at times, Valentine would not come home for days, with the longest period being three days.

¶102. She stated she "would scream, cry, holler," but "nothing helped." In January of 1996, she went to the casino and told him that if he did not leave the casino then the marriage was

49

over. They talked outside and ended up in a fight. She stated that Valentine walked back inside the casino instead of coming home with her. Sandra testified that was the moment that the marriage was over in her mind. According to Sandra, she was married to "someone that didn't show . . . affection."

¶103. Sandra testified that she had come to resent having to have sex with Valentine because he had "turned . . . [her] against him." Sandra stated that Valentine "never spoke to her." She testified that "[h]e never had anything to say, and then he would expect me to just want to touch . . . he just wanted to have sex with me." When Valentine wanted to have sex, she considered the act of sex "just something to get him . . . to get the job done and get through." Sandra alleged that Valentine had failed to provide financial support for their son, J.V., since the divorce and that Fitch was having to support him.

¶104. Fitch testified that at the time the relationship began he knew Sandra was married, but Sandra told him that she "did not have a marriage any more." However, by the time that the relationship became sexual, Fitch testified that he did concern himself about Sandra's marriage. Fleming testified that Sandra had confided in her regarding the problems in her marriage to Valentine.

¶105. Sandra testified that Fitch did nothing to threaten her into the relationship or to remain in a relationship. Further, Fitch never threatened to take K.V. away from her if she did not continue working for him or the relationship. When Valentine insisted that Sandra quit working for Fitch, she refused and testified that she had no intention of ever quitting. Sandra testified that the cash she had came from her salary and commission. Fitch did not give her money in exchange for sexual relations or to entice her into the relationship or to remain in

the relationship. Fitch testified that he never gave Sandra any extravagant gifts and did not recall giving her any money except for her salary and commissions paid in cash like all his employees. Fleming testified that Fitch paid all his employees in cash.

¶106. Valentine confronted Sandra regarding whether she was having an affair. Sandra denied the accusation. Later, Valentine confronted Fitch and Sandra, inquiring if they were having an affair. Both denied the accusation. Valentine was aware that K.V., born in 1999, was not his child. The paternity test showed that Valentine had no chance of being the father.

¶107. Valentine presented no evidence that Sandra was not the initiator of the relationship with Fitch. Valentine made unsupported accusations that Fitch was giving Sandra money to have a relationship with him and that he had threatened to use his money to take K.V. away from Sandra if she ended the relationship. Sandra and Fitch both denied the allegations. Valentine alleged that Sandra sought to "trade up" by becoming involved with Fitch, and he testified as to the change in Sandra's lifestyle since she married Fitch.[27] Years after Sandra and Valentine were divorced, Sandra and Fitch were married and were married at the time of trial.

¶108. This Court has established the required elements of an action for alienation of affections: (1) wrongful conduct of the defendant, (2) loss of affection or consortium, and (3) a causal connection between the conduct and the loss. ***Bland***, 735 So. 2d at 417. However, in order to maintain an action for alienation of affections, "it must be established that the

---

[27] Sandra and Fitch were married at the time of trial.

husband [wife, Sandra,] was induced to abandon the wife [husband, Valentine,] by some active interference on the part of the defendant [Fitch]." *Stanton*, 139 So. at 460. In *Kirk*, this Court again stated that the defendant must "directly and intentionally [interfere] with" plaintiff's marriage, thereby inducing the alienation of affections of the plaintiff's spouse. *Kirk*, 607 So. 2d at 1223.

¶109. Here, according the record, the Valentines' marriage had deteriorated before Sandra began a relationship with Fitch. Nothing contradicted Sandra's assertion that she was the initiator of the relationship with Fitch. She testified that she had no affection left for Valentine for Fitch to have alienated. There is a lack of evidence that Fitch directly and intentionally interfered the Valentines' marriage by inducing Sandra's affections. While Fitch's and Sandra's conduct is clearly not admirable, the evidence fails to support a claim of alienation of affections.

¶110. Further, Valentine failed to present sufficient evidence of any economic loss to support the award of damages he received. Valentine's failure to present any evidence that he suffered financially from the alleged alienation of affections results in our inability to determine that he is entitled to an award of damages. The only argument advanced by Valentine was that he lost his house and physical custody of his son, J.V.

¶111. However, the record provides that Valentine voluntarily surrendered possession of the marital home to Sandra in the property settlement agreement signed by the parties. Sandra agreed to pay Valentine $32,500 for his interest in the house within 30 days of the agreement. Valentine also was granted a divorce on the grounds of adultery as part of the terms of the property settlement agreement.

52

¶112. In fact, the parties' property agreement *specifically* provided that Sandra would admit that Valentine was entitled to a divorce on the ground of adultery as a condition of the property settlement. Therefore, from the language of the settlement agreement, it is apparent that Valentine exchanged the possession and use of the marital home and received $32,500 for his interest in the house in return for Sandra's admission of adultery.

¶113. According to Sandra's testimony, Valentine never sought custody of J.V. Likewise, in the child custody agreement signed by the parties, Valentine allowed Sandra to have the "paramount permanent physical custody of the minor child," J.V., subject to his visitation rights. Sandra testified that Valentine was not paying his child support for J.V. as agreed in the divorce settlement. Valentine admitted that he exchanged the house and custody of J.V. for Sandra's admission of adultery. The record provides:

> Q: Now, in the – what you ended up giving up, basically, is the house and the child, but what you got was an admission of adultery, didn't you?
> A: Yes, sir.
> Q: And that was very important to you, wasn't it?
> A: At the time, yes, sir.
> Q: Because you needed that admission of adultery to get here today, didn't you?
> A: Yes, sir, I believe I did.

¶114. As shown above, Valentine testified that he exchanged possession of the house and physical custody of J.V. for the purposes of developing an alienation of affections lawsuit. However, Valentine later explained that his decision to agree to Sandra receiving physical custody of J.V. was also influenced by his desire to not separate J.V. from his sister, K.V.

¶115. Moreover, Valentine introduced no medical bills in support of any alleged damages he suffered. Valentine testified that he had gone to the hospital once for anxiety and was

prescribed the medication, Paxil, by Dr. Ross Collins. He stated that he took the Paxil for only "a couple of months at the very most." However, no medical records were introduced and no medical charges were introduced by Valentine. Valentine testified that it was hard to focus on his business during the time following the divorce. However, he did not testify that he lost any business during that time. Likewise, Valentine did not testify that he lost any income as a result of the alleged alienation of affections.

¶116. Therefore, I find that the trial court erred in denying Fitch's motion for JNOV. Based on the record, the jury's verdict was incorrect and not based upon legally sufficient evidence to prove a claim of alienation of affections. I would reverse the judgment of the Circuit Court of Marshall County in the amount of $642,000 in actual damages and $112,500 in punitive damages, for a total of $754,500, in favor of Valentine and render judgment in favor of Fitch. As my decision to reverse and render judgment regarding the issue of JNOV, this assignment of error raised by Fitch is dispositive of the other issues he raised on appeal.